

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI, )
)
Respondent, )
)
v. ) No. SC93882
)
JESSE DRISKILL, )
)
Appellant. )

### APPEAL FROM CIRCUIT COURT OF LACLEDE COUNTY
Honorable Kenneth M. Hayden, Judge

*Opinion issued March 31, 2015*

Jesse Driskill (hereinafter, "Driskill") was found guilty of two counts of first-degree murder, section 565.020, RSMo 2000,[1] one count of forcible rape, section 566.030, one count of forcible sodomy, section 566.060, and five counts of armed criminal action, section 571.015. Consistent with the jury's recommendations, Driskill received two death sentences, a consecutive fifteen-year term of imprisonment on the burglary count, and seven consecutive life sentences on the remaining counts. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3. The judgment is affirmed.

---

[1] All further statutory references herein are to RSMo 2000.

**Factual Background**

On July 25, 2010, Driskill and Jessica Wallace (hereinafter, "Wallace") were at the Prosperine River Access on the Niangua River. Together, they did drugs and later "ended up having sex." Driskill and Wallace were interrupted by a police officer. Driskill ran off into the woods with his clothes and a gun. Wallace spoke to the police officer and returned home.

Contemporaneously, J.W. and C.W. (collectively, hereinafter, "the victims") were at their home, located approximately one and one-half miles from the Prosperine River Access. J.W. was 82 years old; C.W. was 76. The victims were celebrating their fifty-ninth wedding anniversary. They were due to return to Highlandville, Missouri,[2] the next day.

When the victims never returned to Highlandville, family members became worried. Multiple attempts were made to reach the victims by telephone, but without success. Concerned family members also contacted hospitals to inquire about the victims, pondering whether they could have had an accident.

On the evening of July 26, the following day, family members arrived at the country house. When they arrived at the house, the doors were locked and the victims' vehicle was not present. One relative entered the residence through a window. The interior was "smoky and smelly." In the dining room, the relative saw C.W.'s feet sticking out from under a big pile of smoldering blankets.

---

[2] The victims' permanent residence was in Highlandville with family members.

The relative opened the front door and told the victims' son to come inside. Together, they found J.W. underneath another pile of blankets with chairs piled on top of him. There were pools of blood near the victims' heads. They called the police.

When the police officers arrived, they found no signs of forced entry. There was an odor of accelerant near the victims. C.W. had burn marks around the top part of her body. Paper towels had been wadded up and burned in her groin area. There was a clear fluid and blood draining from her vaginal and anal areas. C.W. had a blackened area beneath both eyes and a wound above her right eyebrow. J.W. was naked, except for his shoes, and there was a plastic bag over his head. A large amount of blood had drained out of the bag and soaked the carpet beneath his head. There was a wound on his face. C.W.'s purse was emptied on the floor. There was a can of gasoline in the hallway. While police officers were conducting their investigation in the victims' home, they received reports of a burning vehicle near Conway, Missouri.

Meanwhile, Driskill called Wallace, telling her that he needed a ride. Driskill called her again, asking to be picked up on Highway N in Conway. Wallace drove to meet Driskill but had difficulty locating him. She drove up and down the highway a couple of times and stopped at a gas station. She saw smoke in the distance and first responders heading toward the smoke. She eventually went home without locating Driskill.

At approximately 10:45 p.m., Driskill went to Hannah's General Store in Conway to charge his cell phone, but there was no charger. Driskill then went to a nearby Budget Inn, asking to use its telephone. Driskill reached Jessica Cummins (hereinafter,

3

"Cummins"), and he asked her to come get him. Cummins agreed and met Driskill at the Budget Inn.

During the drive, Driskill kept mumbling to Cummins. He said he had "shot someone" and that he "messed up really bad." Cummins also thought he said he had "shot up" some drugs.

About 11:33 p.m., a highway patrol sergeant went to the scene of the burned vehicle, located near the county line of Laclede and Dallas counties. The sergeant recovered the license plate from the vehicle and discovered the vehicle belonged to the victims.

Cummins dropped Driskill off a little after midnight at Codi Vause's (hereinafter, "Vause") house in Lebanon, Missouri. Driskill appeared anxious and exhausted, saying he "needed some help," indicating the authorities were after him. Driskill stated he needed new clothes and that he had killed a couple of people.

At some point, Driskill called Wallace and told her he committed a home invasion, robbery, and a double homicide. Wallace drove to Vause's house. Driskill explained to the group that an elderly couple caught him going through their shed or garage and that he murdered them. Driskill further stated that he ordered them into their house while holding up his gun. Inside the victims gave Driskill money, but Driskill said it was not enough. Driskill then shot J.W., told C.W. to bend over, and raped her. He shot C.W. in

the face, but she tried to get away, so Driskill shot her two more times and "put a plastic bag down her throat and a pillow over her head." [3]

Driskill detailed how he attempted to clean up the evidence. Driskill said he shaved C.W.'s "pussy" and "poured bleach inside of her." Driskill put newspaper in her vaginal area, poured gasoline on her, and lit it. Driskill then used five gallons of gasoline to burn the house. He took the victims' vehicle, which he later burned. Driskill said his shoes were filled with blood.

After listening to Driskill, Wallace left and went to a store where a friend worked. Wallace was upset and crying. A police officer at the store asked her what was wrong. Wallace recounted Driskill's story to the police officer.

Cummins then returned to Vause's home. Driskill was washing out his shoes in the kitchen sink. Driskill changed his clothes and directed Vause to get rid of the clothes he had been wearing. Vause put the clothes into a trash bag. Driskill fell asleep on the couch. The others told Cummins what Driskill told them; they decided to call the police, and they each provided a statement.

On July 27, at approximately 1:45 a.m., law enforcement officers arrested Driskill while he was sleeping on the couch at Vause's home. Driskill awoke and resisted his arrest. During the arrest, Driskill's head hit a coffee table, resulting in a laceration. Driskill continued to resist and was tasered. The officers finally handcuffed Driskill and

---

[3] The timing of whether Driskill raped C.W. prior to killing her or whether he killed her prior to raping her is unclear from the record.

took him to the hospital for treatment. The officers also seized the trash bag containing Driskill's clothes.

Several hours later, law enforcement officers executed a search warrant to collect "DNA, hair samples, anything that would have been involved with [] Driskill or the homicide." They conducted a gunshot residue test. They collected blood stains from Driskill's hands. They seized an unlabeled pill bottle and found a pack of cigarettes in his clothes that had the same "run number" as ones at the victims' home. They also conducted a sexual assault kit on Driskill.

Both of the victims' bodies were autopsied. C.W. had extensive burns on her face, head, back, and legs. The burns were direct thermal injuries, indicating the fire was in constant contact with her skin. There were burnt paper towels and calendar pages between her legs. There was a gunshot wound that traveled along her jawline, exited her neck, and reentered her shoulder. C.W. also was shot above the left eye. This shot was instantly incapacitating and fatal; it was fired from "near contact" or less than an inch away. C.W. had a laceration along her right eyebrow from blunt trauma, and her skull was fractured beneath that laceration. Additionally, C.W. had injuries consistent with sexual assault. There were bruises and tears at the entrance to C.W.'s vagina from penetrating injuries. There were also two small tears at the entrance to C.W.'s rectum.

During the autopsy of J.W., a wadded-up plastic bag was found in his throat. J.W. had a gunshot wound that indicated a bullet entered his right cheek, went through his tongue and throat, exited his neck, and lodged in his shoulder. While this gunshot wound

6

was potentially fatal, J.W.'s cause of death was determined to be asphyxiation due to the plastic bag.

The vaginal swabs from C.W. were subjected to DNA analysis. The first swab produced a mixture from two individuals, C.W. and Driskill. J.W. was eliminated as a contributor to the DNA mixture. Additional testing revealed that it was 94.97 billion times more likely that the mixture was produced by C.W. and Driskill than by C.W. and some other unknown person.

**Procedural Background**

On July 27, 2010, the state filed a complaint and subsequently charged Driskill by amended information with two counts of first-degree murder, one count of first-degree burglary, one count of forcible rape, one count of forcible sodomy, and five counts of armed criminal action. On November 1, 2010, the state gave notice it intended to seek the death penalty.

*Pre-trial Proceedings*

In July 2013, Driskill's counsel advised the trial court that Driskill suffered from "anxiety disorder" and "intermittent explosive disorder." Defense counsel then requested, should Driskill believe he would have a panic attack, that he be permitted to leave the courtroom and participate in part of proceedings via a closed-circuit television. The trial court questioned Driskill regarding his counsel's request. Driskill confirmed that he wanted to be able to leave the courtroom, if he felt he would have a panic attack.

On August 14, 2013, Driskill's counsel again requested the trial court accommodate Driskill by allowing him to remove himself from the courtroom and

7

observe the proceedings by closed-circuit television if he felt he was about to have a panic attack. At that time, Driskill's counsel advised the trial court that it retained an expert (hereinafter, "Dr. Gruenberg") who determined in May 2013, that Driskill was incompetent to stand trial without being medicated. Driskill's counsel then disclosed Driskill was evaluated by another expert (hereinafter, "Dr. Fucetola") in July 2013, who determined that Driskill was competent to stand trial without being medicated. Driskill's counsel stated that "we may have to ask for a competency evaluation in the middle of trial."

*Voir dire*

During voir dire on August 14, 2013, Driskill's counsel informed the trial court that Driskill needed to leave the courtroom. Accordingly, the trial court called a recess and allowed Driskill to leave. Driskill's counsel notified the trial court that Driskill had suffered a panic attack outside the courtroom and did not "think that he [could] participate in the trial right now at this moment meaningfully."

Driskill was escorted to a cell. When he entered the cell, a deputy observed him punch the wall, appear to be red in the face, crying, rubbing his head, and kneeling over as if his stomach were hurting. A second deputy reported Driskill had been sick.

Driskill's counsel requested a competency examination. The trial court inquired as to the results of Driskill's two previous examinations. Driskill's counsel informed the trial court that, while Dr. Fucetola's examination was more proximate in time, Dr. Fucetola could not give an opinion as to whether during the middle of trial Driskill would be competent if he suffered a panic attack. The trial court noted that if Driskill were

8

evaluated again in jail, the examination would be no different in that he would not be evaluated at the time of trial, and it denied the request for another competency evaluation.

After Driskill calmed down, defense counsel spoke briefly with him. Defense counsel reported to the trial court that she did not have "a really good conversation with him." Defense counsel believed Driskill was not able to participate actively in trial. Further, defense counsel requested a recess for the day with the accommodation of allowing Driskill to participate by closed-circuit television on the following day. The trial court agreed, recessing for the day and allowing Driskill to participate via closed-circuit television the following day. Driskill's counsel clarified that the request for participation via closed-circuit television was in lieu of the motion for a competency evaluation because the trial court had overruled the motion for a competency evaluation.

On August 15, 2013, at the trial court's request, Driskill admitted the evaluations of Drs. Gruenberg and Fucetola into the record. Dr. Gruenberg's report dated May 13, 2013, concluded that Driskill was "incompetent for trial without being placed on Neurontin." Dr. Fucetola's examination conducted on July 13, 2013, concluded that Driskill "does have the adequate capacity to appreciate his own legal situation, he has a rational understanding of the legal situation, he has an adequate factual understanding of the legal system and process of adjudication and the capacity to assist his own counsel in his defense."

The trial court questioned Driskill, who was participating in the proceedings via closed-circuit television. The trial court inquired as to whether Driskill was able to hear the proceedings and how he was feeling. Driskill confirmed that he was able to hear the

9

proceedings and that he was calmer; there was nothing prohibiting him from understanding the proceedings. Driskill asked to be excused from the courtroom for the day, and he understood he had a right to be present. Further, Driskill stated he had no questions and did not need additional time to speak with his counsel. Driskill corroborated the fact that he wanted to participate via closed-circuit television for the day's proceedings and he had not been threatened or promised anything to induce him to participate by the closed-circuit television system. The trial court found that Driskill was calm, and there was no evidence before the court that he was suffering from any duress. Driskill stated that he hoped to return to the courtroom on the following day.

Defense counsel reiterated the belief that Driskill was not competent to proceed without medication. The trial court directly questioned Driskill, who stated he was thinking clearly and nothing was preventing him from communicating with his counsel or assisting in his defense. Driskill confirmed he had a telephone so he could communicate with his counsel, either by calling or texting. The trial court observed, and Driskill confirmed, that he was calmer than the previous day.

On August 16, 2013, Driskill was present in the courtroom. There were no issues.

*Guilt phase*

On the fourth day of trial, August 19, 2013, Driskill was present in the courtroom when the guilt phase of his trial began. Driskill's counsel requested a competency evaluation and presented an e-mail from Dr. Fucetola, which was received over the weekend. Dr. Fucetola's statement indicated that based on his understanding of the

10

events during voir dire, in the moments before, during, and after a panic attack, Driskill may not be able to assist his counsel adequately.

There were no issues on the fourth day of trial. At the end of the day, defense counsel reported Driskill was able to converse with her, answer questions, and assist in his defense. Driskill's counsel had no reason to believe he was "under any type of duress or mental disability" during the day.

On the fifth day of trial, August 20, 2013, Driskill was present in the courtroom. The state concluded presenting its case. There was no indication Driskill was not competent to stand trial.

Driskill decided he would not take the stand to testify. Driskill communicated his decision with counsel and gave rational answers when the trial court questioned him. The trial court inquired as to whether Driskill understood his right to testify and whether anyone threatened or coerced him to waive his right. Driskill provided coherent and rational responses to this inquiry. Driskill confirmed the decision not to testify was his alone. Driskill stated, "I want to testify, but I just know I can't. I mean I'm not good with people."

On August 21, 2013, the sixth day of trial, the trial court again questioned Driskill regarding whether he wanted to testify. Driskill's counsel presented an argument, believing Driskill refused to testify for fear that he would have a panic attack while testifying. There were no issues with Driskill's anxiety level during his counsel's presentation of evidence or during closing arguments. Driskill's counsel confirmed this, stating that Driskill was able to assist in his defense during this portion of the trial.

11

During the trial court's reading of the verdict, Driskill asked to be escorted from the courtroom. Driskill requested to be excused after the trial court read the first seven guilty verdicts. The trial court granted a recess and requested his counsel speak with Driskill to determine whether he wanted to be present for the reading of the remaining verdicts. During this recess, there was no evidence presented that Driskill was suffering from another panic attack. Driskill decided that he did not wish to be present for the reading of the remaining verdicts. The jury found Driskill guilty on all counts.

*Penalty phase*

The penalty phase of Driskill's trial began on August 22, 2013, the seventh day of trial. Driskill's counsel stated that he was able to assist the defense, but he was in a "somewhat of a heightened state of anxiety."

During the state's opening argument, Driskill asked to be excused from the courtroom. The trial court granted his request, holding the court in recess. When the court reconvened, and out of the presence of the jury, the trial court spoke with Driskill. The trial court inquired as to whether Driskill believed that he would have an "episode" during the presentation of the state's evidence. Driskill stated, "I know I'll snap out."

Focusing only on the time period for the state's presentation of evidence, the trial court questioned Driskill as to whether he wished to remain in the courtroom. Driskill indicated he did not want to remain physically in the courtroom because he felt uneasy. The trial court offered Driskill the opportunity to participate via closed-circuit television as he did on the first day of voir dire. Driskill declined, stating that he did not like it. Further, he did not want to watch the proceedings remotely. Driskill requested to be

12

excused. The trial court inquired as to whether anyone had threatened him and he understood he had the right to be present. The trial court excused Driskill for the presentation of the state's evidence and indicated that the issue would be revisited later that day.

Driskill's counsel requested a competency evaluation, a mistrial, or a recess for an undetermined amount of time until Driskill believed he could be in the courtroom without feeling anxious. The state opposed Driskill's requests as he appeared calm during the trial court's questioning and was able to answer all questions coherently. Driskill's counsel disagreed, stating that Driskill's legs were shaking, he was wringing his hands, and he was perspiring a little bit. The trial court asked whether there was any new evidence it should consider it support of the claim for a competency evaluation. Driskill had no additional evidence to support his claims of a diminished mental capacity. Driskill asked to be excused from the courtroom before the jury returned.

After the state finished presenting its penalty phase witnesses, Driskill returned to the courtroom outside the presence of the jury. Driskill reaffirmed his desire to not be present for the presentation of the evidence on his behalf, and he asked to be excused again. The trial court inquired again as to whether anyone had threatened him and whether he understood he had the right to be present. Driskill reaffirmed that he did not wish to participate via closed-circuit television or watch the proceedings remotely. The trial court explained that, as it planned to take a mid-afternoon break, his counsel would have the opportunity to visit with him then, and he would have the opportunity to return

13

to the courtroom if he desired. The trial court also noted that Driskill did not appear to be under duress but noticed his leg bouncing a bit.

After Driskill's counsel finished presenting evidence on his behalf, the trial court took another recess so it could discuss with Driskill whether he wanted to testify in the penalty phase. Driskill indicated that he did not want to testify, he understood he had the right to remain silent, he had ample time to discuss the issue with counsel, and no one had threatened him regarding his decision. Driskill chose to remain in the courtroom during the instruction conference and penalty phase closing arguments. Following the closing arguments, Driskill asked to be excused.

Driskill returned to the courtroom while the trial court excused the alternate jurors. Driskill was also present when the trial court read the jury's final verdicts and during the polling of the jurors.

The jury recommended death sentences for each count of first-degree murder. In regard to C.W.'s murder, the jury found nine statutory aggravating circumstances. In regard to J.W.'s murder, the jury found eight statutory aggravating factors. On November 5, 2013, the trial court sentenced Driskill to death for each count of first-degree murder. Further, the trial court imposed consecutive sentences of fifteen years' imprisonment for burglary and life imprisonment for each of the other offenses. Driskill appeals.

**Standard of Review**

This Court reviews a sentence of death on direct appeal for prejudice, not just mere error. *State v. Anderson*, 306 S.W.3d 529, 534 (Mo. banc 2010). This Court will

14

reverse a trial court's decision only when an alleged error is so prejudicial that the defendant was deprived of a fair trial. *State v. Johnson*, 284 S.W.3d 561, 568 (Mo. banc 2009); *State v. McFadden*, 391 S.W.3d 408, 417 (Mo. banc 2013). Prejudice exists when there is a reasonable probability that the trial court's error affected the outcome at trial. *McFadden*, 391 S.W.3d at 417. Evidence admitted at trial is reviewed in the light most favorable to the verdict and is reviewed for an abuse of discretion. *Anderson*, 306 S.W.3d at 534.

Driskill raises six points on appeal. They are all denied.

### Point I: Mental Competency

Driskill alleges the trial court erred in accepting the guilty verdicts and sentencing him because he was not mentally competent to stand trial. Driskill claims he suffered from anxiety and panic attacks, which rendered him unable to consult with his counsel and assist in his own defense. Driskill asserts that, given the evidence presented to the trial court, he was not competent to stand trial. Accordingly, Driskill believes the trial court had a duty to stop the trial and order a competency evaluation.

"It has long been accepted that a person whose mental condition is such that he [or she] lacks the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel, and to assist in preparing his [or her] defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed2d 103 (1975). "[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him [or her] of his [or her] due process right to a fair trial." *Id.* at 172.

15

A trial court "is required to initiate proceedings to investigate the competency of a defendant 'whenever a reasonable judge in the same situation as the trial judge would experience doubt about the defendant's competency to stand trial.'" *State v. Anderson*, 79 S.W.3d 420, 432 (Mo. banc 2002) (quoting *State v. Johns*, 34 S.W.3d 93, 104 (Mo. banc 2000)); *see also* section 552.020.2. A trial court's determination regarding a defendant's competency is a factual determination that will be upheld unless there is no substantial evidence to support it. *Anderson*, 79 S.W.3d at 433; *State v. Whitt*, 330 S.W.3d 487, 493 (Mo. App. E.D. 2010); *State v. Elam*, 89 S.W.3d 517, 521 (Mo. App. W.D. 2002). "The standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him [or her].'" *Zink v. State*, 278 S.W.3d 170, 183 (Mo. banc 2009) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)).

When reviewing the trial court's determination, this Court does not weigh the evidence, but accepts as true all evidence and reasonable inferences that tend to support the trial court's findings. *Id.* A defendant is presumed competent to stand trial and bears the burden of showing that he or she is incompetent. Section 552.020.8; *Anderson*, 79 S.W.3d at 432-33. "The trial court has broad discretion in deciding whether to grant a psychological exam, and is not a mere 'automaton' that must grant these motions merely because they are filed." *State v. Bracken*, 382 S.W.3d 206, 212 (Mo. App. E.D. 2012) (citing *United States v. McEachern*, 465 F.2d 833, 837 (5th Cir. 1972)).

16

Here, the trial court determined that there was no need for a competency

evaluation during either the guilt or penalty phase of Driskill's trial. However, Driskill

argues that there were multiple factors presented to the trial court that should have

triggered the trial court's duty to order a competency hearing. Driskill asserts the factors

presented to the trial court were the findings of the two doctors, Driskill's panic attack

during voir dire, and his mental health history. Driskill paints a portrait of a mentally

incompetent defendant who is unable to participate in his criminal defense, but this

picture is refuted by the record.

The first request for a competency hearing was made after Driskill had a panic

attack during voir dire. When Driskill knew the panic attack was beginning, he informed

his counsel, who informed the trial court. Immediately, the trial court excused Driskill

from the courtroom. The trial court recessed the proceedings for the rest of the day, and

prior to resuming, the trial court made its own independent inquiry into Driskill's state of

mind.

At the trial court's request, Driskill presented the results of two mental

competency evaluations prepared prior to trial by Drs. Gruenberg and Fucetola. Dr.

Gruenberg believed that in May 2013, Driskill was incompetent to stand trial without

being medicated. Dr. Gruenberg's report concluded that Driskill "understands the

components of the court and the roles of most individuals in the court room as well as the

basic court room proceedings, however he is likely unable to appropriately assist in his

defense during trial, in addition to possibly becoming explosive and disruptive during the

trial proceedings." Dr. Fucetola's examination in July 2013, determined that based on his

17

clinical interview of Driskill, review of his records, and the standardized testing he performed, Driskill "has an adequate factual understanding of the legal system and process of adjudication and the capacity to assist his own counsel in his defense."

The trial court observed Driskill in the courtroom and questioned him as to his state of mind, seeking to determine whether he was able to assist in his defense. Additionally, the trial court questioned defense counsel as to whether Driskill was able to assist in his defense. The fact that the trial court chose to believe one expert's evaluation does not diminish this determination. The trial court had a rational basis to believe a competency examination that was closer in time to the trial and contained a series of standardized tests, which were not included in the previous report. A "mere disagreement among experts does not necessarily indicate error on the part of the trial court. On the contrary, it is the duty of the trial court to determine which evidence is more credible and persuasive." *State v. Baumruk*, 280 S.W.3d 600, 609 (Mo. banc 2009) (quoting *Anderson*, 79 S.W.3d at 433); *see also Helton v. Director of Revenue, State of Mo.*, 944 S.W.2d 306, 310 (Mo. App. W.D. 1997) (stating that when there is a conflict in the evidence the fact finder "is entitled to believe all, none, or any part of the testimony, including testimonial records.").

After receiving all of this information, the trial court determined that an additional competency evaluation was not necessary. Driskill had a factual understanding of the proceedings. Driskill and his counsel confirmed Driskill had the present ability to consult with his counsel and assist in his own defense. *See Zink*, 278 S.W.3d at 183.

18

Any time that Driskill felt he was unable to remain in the courtroom, he was accommodated. The trial court continually asked Driskill how he felt and whether he was able to assist his counsel. There was no indication that Driskill was unable to understand the proceedings against him or assist in his own defense.

During the penalty phase of trial, Driskill stated that he was "uneasy" at times and that he did not want to remain in the courtroom. It is axiomatic that a person facing a sentence of death may become uneasy; it would be illogical to not be uneasy at such a time.

While Driskill points to various occurrences at trial, which he believes should have called into question his competency, none are persuasive. The trial court relied upon a report from one of Driskill's experts, and it extensively questioned both Driskill and his counsel regarding his state of mind. Throughout the guilt and penalty phases of trial, the trial court took adequate precautions to ensure that when Driskill believed he would suffer a panic attack, he was able to leave the courtroom. When Driskill actually suffered one panic attack, the trial court recessed until it ensured Driskill had calmed down and was able to resume assisting in his defense.

Driskill presented no additional evidence that he was unable to understand the proceedings against him or was unable to participate in his own defense at any point during the guilt or penalty phases of his trial. There was substantial evidence supporting the trial court's finding that Driskill was competent to stand trial based upon Driskill's own expert reports and the trial court's continual questioning of Driskill and his counsel.

Driskill failed to meet his burden to demonstrate he was not competent to stand trial; there was no error.

## Point II: Right to be Present

Driskill claims the trial court erred in allowing phases of his trial to proceed without his physical presence in the courtroom. Driskill states that he could not waive his right to be present at his trial, and even if he could, any waiver was not voluntary because he could not remain in the courtroom without suffering panic attacks in the presence of the jury.

Underlying the entirety of Driskill's argument is the premise that he was incompetent throughout the entirety of his trial and he should not have been tried. This proposition has been rejected. This Court has affirmed herein that Driskill was able to understand the proceedings against him and assist in his own defense.

Driskill asserts that he objected repeatedly to appearing by closed-circuit television because the trial court denied his motion for a competency hearing. However, the record demonstrates that Driskill never presented an objection to the trial court that he was denied his right to be present.

"To properly preserve an issue for an appeal, a timely objection must be made during trial." *State v. McFadden*, 369 S.W.3d 727, 740 (Mo. banc 2012) (quoting *State v. Cooper*, 336 S.W.3d 212, 214 (Mo. App. E.D. 2011)). The objection at trial must be specific and made contemporaneously with the purported error. *State v. Shockley*, 410 S.W.3d 179, 204 n.4 (Mo. banc 2013). To preserve a constitutional claim of error, the claim must be raised at the first opportunity with citation to specific constitutional

20

sections. *State v. Tisius*, 362 S.W.3d 398, 405 (Mo. banc 2012). On appeal, the objection presented to the trial court may not be broadened. *Id.*

Accordingly, Driskill's challenge to his right to remain present in the courtroom on the grounds that it violated his constitutional rights can be reviewed only for plain error. Rule 30.20. "Plain error is found when the alleged error 'facially establish[es] substantial grounds for believing a manifest injustice or miscarriage of justice occurred.'" *State v. Dorsey*, 318 S.W.3d 648, 652 (Mo. banc 2010) (quoting *State v. Salter*, 250 S.W.3d 705, 713 (Mo. banc 2008)).

Driskill ponders whether he could waive the right to be present at trial. "The right to be present at critical stages of trial is guaranteed by the United States Constitution, the Missouri Constitution, and Missouri statutory law." *Johns*, 34 S.W.3d at 116. The "broad dicta … that a trial can never continue in the defendant's absence [has] been expressly rejected." *Illinois v. Allen*, 397 U.S. 337, 342, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970) (internal citations omitted); *see also State v. Drope*, 462 S.W.2d 677, 682 (Mo. 1971); *Johns*, 34 S.W.3d at 116. Driskill could waive his right to be present.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938). When a defendant choses to waive a constitutional right, the waiver must be voluntarily, knowingly, and intelligently made. *Bracken*, 382 S.W.3d at 211. "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific*

21

*detailed* consequences of invoking it." *United States v. Ruiz,* 536 U.S. 622, 628, 122 S.Ct. 2450, 2455, 153 L.Ed.2d 586 (2002) (emphasis in original) (determining whether a guilty plea was made voluntarily).

This Court has found that waivers pursuant to Rule 27.01(b) require the record to be unmistakably clear. *State v. Baxter*, 204 S.W.3d 650, 654-55 (Mo. banc 2006). Accordingly, the "best practice for a trial court is to question the defendant personally, on the record, to ensure that the defendant understands the right, understands what is lost in the waiver, has discussed the issue with defense counsel, and voluntarily intends to waive the right." *Id.* at 655. Following this procedure, a defendant later has no argument to later declare the waiver was ineffective. *Id.* Similarly, in the context of a defendant providing a knowing and intelligent waiver of the right to counsel, this Court stated that the trial court must "engage in a colloquy with the defendant to make certain the defendant understands 'exactly what rights and privileges he [or she] is waiving, as well as the dangers associated with waiving constitutional rights.'" *State v. Davis*, 318 S.W.3d 618, 630-31 (Mo. banc 2010).

Missouri courts have found that a defendant may purposefully absent him or herself from the courtroom and thereby, waive the right to be present, even without a statement on the record. *See State v. Bowens*, 964 S.W.2d 232, 239 (Mo. App. E.D. 1998); *Bracken*, 382 S.W.3d at 211-12; *Drope*, 462 S.W.2d at 681. Further, this Court has recognized that a defendant may not be inclined to remain in the courtroom during certain penalty phase testimony given the fact that it would concern topics that the

defendant may find sensitive, including childhood abuse, educational levels, and mental abilities. *Johns*, 34 S.W.3d at 106.

In this case, the trial court repeatedly questioned Driskill on the record regarding whether he wished to remain present in the courtroom. Driskill requested leave to not be present, and the trial court, after confirming this was Driskill's voluntary choice, allowed him to remove himself from the courtroom proceedings. Any time Driskill decided that he did not want to remain in the courtroom, he executed a valid waiver on the record of his right to be present.

Driskill claims that, because he was not present in the courtroom, the jury was left to speculate. He states the jury could have not fully appreciated the gravity of its role in sentencing a person to death and could morally disengage from its decision. Driskill also asserts that the jury could come to nefarious conclusions in reasoning why he was not in the courtroom. Any unintended consequences that may have resulted from Driskill's request to remove himself from the courtroom does not affect the validity of his waiver. *See Ruiz,* 536 U.S. at 628, 122 S.Ct. at 2455.

Driskill fails to present any argument or reason why he was prevented from appearing or that his absence was anything other than intentional. Prior to every instance when he did not appear in the courtroom, Driskill made a clear waiver on the record as to his absence. The trial court did not plainly err in granting Driskill's requests to not remain in the courtroom.

**Point III: Right to Testify**

Driskill avers the trial court erred in finding he voluntarily waived his right to testify during both the guilt and penalty phases of his trial. Driskill claims that any waiver was involuntary because Driskill told the trial court he wanted to testify but he felt he could not due to his untreated mental illness.

"A criminal defendant has a constitutional right to testify in his own behalf at trial." *Davis*, 318 S.W.3d at 637; *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). "The decision to testify solely rests with the defendant …." *State v. Edwards*, 173 S.W.3d 384, 386 (Mo. App. E.D. 2005) (quoting *Rousan v. State*, 48 S.W.3d 576, 585 (Mo. banc 2001)). However, the defendant may knowingly and voluntarily waive the right to testify. *Davis*, 318 S.W.3d at 637.

Driskill's contention again is predicated upon the erroneous underlying premise that he is incompetent to stand trial. Driskill argues that he was coerced into waiving his right to testify because he was denied the benefit of being medicated. Hence, Driskill claims it was impossible for him to testify without having a panic attack.

Driskill asserts on appeal that he wanted to testify, but that he was compelled to waive this right. Driskill claims the trial court was informed of this coercion when he informed the trial court, "I want to testify, but I just know I can't. I mean I'm not good with people." Driskill understood he had the right to remain silent, and there would be no inference drawn from his silence. The trial court questioned Driskill multiple times, seeking to verify that no one had threatened or coerced him into choosing to waive his

24

right to testify. Driskill never altered his decision not to testify or his response that he was not being threatened or coerced into not testifying.

Driskill analogizes his case to *Flemming v. State*, 949 S.W.2d 876, 879 (Tex. App. 1997), to support his argument that "physical or mental compulsion may remove the element of voluntariness from a defendant's decision to incriminate himself." In *Flemming*, the defendant was arrested after his DNA matched samples recovered from a rape victim. *Id.* at 878. After being given his *Miranda*[4] warnings twice, the defendant waived his rights and provided a bifurcated statement to a detective. *Id.* The first portion of the defendant's statement was recorded by a tape recorder sitting on the table in plain view. *Id.* The detective turned off the recorder, and the defendant continued speaking, ultimately admitting he had sex with the victim after entering her home. *Id.* The detective stepped out of the room, activated a hidden recording device, and returned to take the second portion of defendant's statement. *Id.* The defendant acknowledged he was aware of his rights, and he did not want his statement to be recorded. *Id.* The detective continued the interview, wherein the defendant admitted to consensual intercourse with the victim. *Id.*

On appeal, the defendant claimed the trial court failed to suppress the second portion of his statement because it was involuntary. *Id.* The Texas court noted that "[c]riminal defendants … are constitutionally protected only from compulsory self-incrimination." *Id.* at 879. Further, it noted that while a defendant may waive a

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

constitutional right, physical or mental compulsion may remove the component of voluntariness. *Id.* "The waiver, therefore, must be voluntary in the sense that it is the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.*

The Texas court provided examples of impermissible conduct designed to overcome a suspect's free will. *See Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963) (finding police officer informing a suspect she would lose welfare benefits and custody of her children if she did not confess was a form of mental compulsion), and *Spano v. New York*, 360 U.S. 315, 323, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265 (1959) (finding it impermissible for a police officer to suggest to a suspect, who is also a close friend, that the officer's future in the police department might be in jeopardy if the suspect did not confess). The Texas court also provided examples of conduct that did not overcome a suspect's free will. *See Rodriquez v. State*, 934 S.W.2d 881, 890 (Tex. App. 1996) (finding it not improper for interrogating officer to tell the suspect that the victim, on his deathbed, identified the suspect when that event did not occur), and *Fraizer v. Cupp*, 394 U.S. 731, 737-38, 89 S.Ct. 1420, 1423-24, 22 L.Ed.2d 684 (1969) (finding it permissible for officers to inform a suspect his accomplice provided a complete confession when there was none). The Texas court concluded that the defendant's ignorance of the hidden recording device could not have compelled him to confess. *Flemming*, 949 S.W.2d at 879. Accordingly, the detective's deception was not coercive and could not have overborn the defendant's will. *Id.*

26

Here, Driskill asserts that because he was incompetent to stand trial, the voluntariness of his waiver was invalid. Driskill's argument relies on the incorrect assumption that he was incompetent to stand trial.

The record is devoid of any mental anguish that could lead one to believe Driskill did not voluntarily relinquish his right to testify or that he was being coerced. Driskill's responses to the trial court's examination were unequivocal, clear, and straightforward. Driskill even stated that, "I'm not good with people." There is no indication there was any coercion on the trial court's part to force Driskill to waive his right to testify. The record demonstrates the trial court questioned Driskill on multiple occasions about his decision not to testify to ensure that Driskill understood his constitutional right.

There is no evidence, and Driskill makes no argument, that there was any coercion in forcing him to waive his right to testify. Driskill had full knowledge of all of the facts and circumstances surrounding his right to testify; there was no additional fact or scenario that would occur should he choose to waive his right to testify. *C.f. Lynumn*, 372 U.S. at 534 (finding the suspect must confess or lose additional rights) and *Spano*, 360 U.S. at 323 (finding the suspect must confess or a close friend could lose his employment).

Finally, while admittedly not preserved in the record, Driskill now argues the trial court should have made accommodations for him to testify since he suffered from what he claims was, at the least, a physical disability. Driskill asserts that the trial court was required to ensure equal access to disabled individuals pursuant to the Americans with Disabilities Act.

27

Yet, Driskill fails to present any evidence that he was disabled pursuant to any statutory provision of the Americans with Disabilities Act or that he was denied equal access to the witness stand. Further, Driskill's alleged disability of having panic attacks was known by the trial court and accommodated so that Driskill did not appear in the courtroom when he suffered from the one panic attack during voir dire. This argument is specious.

While Driskill expressed some interest in testifying, he consulted with counsel and voluntarily chose to waive his right to testify. There was no error.

### Point IV: Denial of Continuance to be Medicated

Driskill asserts the trial court erred in overruling his motion for a continuance, failing to order him to be medicated, and proceeding through trial when he was in need of psychiatric treatment and medication. Driskill claims the denial of medication caused him to experience such extreme anxiety at trial that he was physically and mentally ill and he was prevented from participating and assisting his counsel.

The trial court is vested with sound discretion to grant a continuance. *State v. Edwards*, 116 S.W.3d 511, 535 (Mo. banc 2003); *State v. Christeson*, 50 S.W.3d 251, 261-62 (Mo. banc 2001). "Reversal is warranted only upon a very strong showing that the court abused its discretion and prejudice resulted." *Edwards*, 116 S.W.3d at 535.

Again, Driskill's argument in this point proceeds from the belief that he was incompetent to stand trial. Driskill asserts the trial court should have ensured he was medicated so he could participate fully in his trial. Without the medication, Driskill

28

claims he was not able to assist in his defense. This Court has addressed this argument and found Driskill to be competent to stand trial.

Driskill has failed to make a showing that the trial court abused its discretion in failing to grant a continuance. When Driskill suffered from his panic attack, the trial court recessed for the day, thereby allowing Driskill the time he needed to recover. Further, whenever Driskill felt he needed to leave the courtroom, he was allowed to do so, and the trial court granted a recess. The trial court made multiple inquiries of Driskill and his counsel as to whether Driskill was able to proceed with trial and assist in his defense throughout the entire trial. There is no showing that Driskill was incompetent to stand trial without being medicated; there was no error.

### Point V: Request to View Exhibits

Driskill claims the trial court erred in denying the jury's request to view all of the exhibits admitted into evidence during the penalty phase. Driskill asserts the trial court erred in barring the jury from viewing defense exhibits because they were crucial in supporting his case for a sentence of life without parole and to rebut the state's inferences and arguments. Driskill argues that the failure to send the exhibits to the jury resulted in a violation of his right to present evidence in mitigation.

During its penalty phase deliberations, the jury sent a note to the trial court stating, "We would like to see all evidence/submissions during the penalty phase." The trial court previously informed the state and Driskill that if exhibits were requested by the jury either all or none of the exhibits would be provided.

29

Driskill wanted to provide the jury all of the records supporting the testimony of Drs. Robert Hanlon and William Bernet, two of the witnesses he presented in support of mitigation. These supporting records were voluminous and contained more than 1,100 pages. However, Driskill objected to providing the jury with the state's prior conviction exhibits. Driskill objected to redacting copies of the state's prior conviction exhibits, believing it would suggest to the jury that Driskill was guilty of other criminal acts. Driskill suggested that rather than sending the state's redacted exhibits, the jury receive a list of the convictions and accompanying information the state read to the jury. Driskill's suggestion, however, was not accepted. Ultimately, the state and Driskill were unable to arrive at an agreement regarding the exhibits, and, accordingly, the trial court responded to the jury that "You must be guided by the instructions given and the evidence as you remember it." No exhibits were sent to the jury.

"Even where an exhibit is properly admitted into evidence, the decision whether the exhibit should be sent back to the jury during deliberations remains a matter within the sound discretion of the trial court." *State v. Roberts*, 948 S.W.2d 577, 596 (Mo. banc 1997); *see also State v. Barnett*, 980 S.W.2d 297, 308 (Mo. banc 1998). An abuse of discretion occurs only when the trial court's decision to exclude an exhibit from the jury's deliberation was clearly against reason and resulted in an injustice to the defendant. *State v. Wolfe*, 13 S.W.3d 248, 257 (Mo. banc 2000), *abrogated by Mitchell v. Kardesch*, 313 S.W.3d 667 (Mo. banc 2010).

Driskill asserts that his case is analogous to *Taylor v. State*, 262 S.W.3d 231 (Mo. banc 2008), and *Hutchison v. State*, 150 S.W.3d 292 (Mo. banc 2004), *abrogated by*

30

*Mallow v. State*, 439 S.W.3d 764 (Mo. banc 2014). However, both *Taylor* and *Hutchison* were cases wherein this Court found trial counsel to be ineffective for failing to present mitigation evidence available to counsel or information that counsel should have investigated and introduced. *See Taylor*, 262 S.W.3d at 249-53; *Hutchison*, 150 S.W.3d at 307-08. *Taylor* and *Hutchison* are dissimilar to the facts and circumstances surrounding Driskill's argument because Driskill's counsel investigated and introduced substantial evidence in mitigation.

Here, Driskill claims the trial court abused its discretion in failing to provide only the documents supporting the testimony of Drs. Hanlon and Bernet, which exceeded 1,100 pages. The trial court committed no error in not providing the jury with a voluminous, one-sided record.

### Point VI: Victim Impact Evidence

Driskill alleges the trial court abused its discretion in overruling his objections and in admitting excessive victim impact testimony and evidence. Driskill made a continuing objection as to the testimony of the three relatives and the admission of the photographs of the victims, seeking "[t]o exclude victim impact evidence." Driskill claims the state's excessive victim impact evidence and testimony overwhelmed the jury with emotion and encouraged it to weigh the value of his life against the victims' lives.

Victim impact evidence is admissible under the United States and Missouri Constitutions. *State v. McLaughlin*, 265 S.W.3d 257, 273 (Mo. banc 2008). The trial court has broad discretion to admit whatever evidence it determines may be helpful to the jury in assessing punishment. *State v. Bowman*, 337 S.W.3d 679, 691 (Mo. banc 2011).

31

The state is permitted to show the victims are individuals whose deaths represent a unique loss to society and to their family and that the victims are not simply faceless strangers. *State v. Gill*, 167 S.W.3d 184, 195 (Mo. banc 2005); *see also McFadden*, 391 S.W.3d at 423 ("Victim impact evidence, and related argument about the impact of the crime upon the victim and victim's family, is admissible in the penalty phase."). Victim impact evidence violates the constitution if it is "so unduly prejudicial that it renders the trial fundamentally unfair." *State v. Forrest*, 183 S.W.3d 218, 225 (Mo. banc 2006).

Three of the victims' relatives provided victim impact testimony in this case: their son, their granddaughter, and their granddaughter's husband. Each provided a picture of C.W. and J.W.'s long-lasting, loving relationship and a glimpse into their lives since the time of the victims' murders. The victims' granddaughter laid the foundation for multiple photographs depicting C.W. and J.W. at various times in their lives.

Clearly, victim impact statements are admissible to illustrate the loss to the family. *Gill*, 167 S.W.3d at 195. Further, admission of photographs is not *per se* prejudicial to a defendant. In comparison, this Court has not found an abuse of discretion in allowing a jury to view twenty-seven photographs of the victim and his family as part of the victim impact evidence. *Id.*

Driskill presents no argument as to how the family's relatively brief statements of loss[5] were so excessive and emotionally-charged that his sentencing was rendered unfair. There was no error.

---

[5] The testimony of the three family members was contained on approximately eighteen pages of the 1,775 page transcript.

## Proportionality Review

This Court is obliged to conduct an independent review of all death penalty cases for proportionality, even when not requested by a defendant. Section 565.035. Section 565.035.3 requires this Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

### *(1) Passion and prejudice*

After an independent review of the record, this Court does not find that the sentence of death was imposed under the influence of passion, prejudice, or any other factor. Driskill has not identified any such factor to this Court, and his allegations of trial court error are without merit.

### *(2) Aggravating circumstances*

Driskill does not claim that the evidence does not support the jury's findings beyond a reasonable doubt as to at least one statutory aggravating circumstance. Section 565.035.3(2). The jury made findings of multiple aggravating circumstances surrounding both the victims' murders.

As to C.W's murder, the jury found multiple statutory aggravating circumstances:

33

1. Driskill had two separate serious assaultive convictions in two different counties.[6]

2. C.W.'s murder was committed while engaged in the commission of another unlawful homicide of J.W..

3. Driskill murdered C.W. for the purpose of receiving money or another thing of monetary value from her or another.

4. C.W.'s murder involved depravity of mind and was outrageously and wantonly vile, horrible, and inhuman.

5. C.W.'s murder was committed while Driskill was engaged in the perpetration of a burglary.

6. C.W.'s murder was committed while Driskill was engaged in the perpetration of a robbery.

7. C.W.'s murder was committed while Driskill was engaged in the perpetration of forcible rape.

8. C.W.'s murder was committed while Driskill was engaged in the perpetration of forcible sodomy.

As to J.W.'s murder, the jury found multiple statutory aggravating circumstances:

1. Driskill had two separate serious assaultive convictions in two different counties.[7]

2. J.W.'s murder was committed while engaged in the commission of another unlawful homicide of C.W..

3. Driskill murdered J.W. for the purpose of receiving money or another thing of monetary value from him or another.

4. J.W.'s murder was committed while Driskill was engaged in the perpetration of a burglary.

---

[6] The jury found this to be two separate serious assaultive convictions, one for each county.

[7] The jury found this to be two separate serious assaultive convictions, one for each county.

5. J.W.'s murder was committed while Driskill was engaged in the perpetration of a robbery.

6. J.W.'s murder was committed while Driskill was engaged in the perpetration of a forcible rape.

7. J.W.'s murder was committed while Driskill was engage in the perpetration of a forcible sodomy.

"The jury need find only one statutory aggravating circumstance in order to recommend imposition of the death penalty." *State v. Clay*, 975 S.W.2d 121, 145 (Mo. banc 1998); *see also Shockley*, 410 S.W.3d at 202. After this Court's independent review, there was sufficient evidence supporting the jury's findings of at least one statutory aggravating circumstance for each of the victims beyond a reasonable doubt. Further, Driskill fails to assert any error in submission of these statutory aggravators.

*(3) Similar cases*

This Court's independent review reveals that imposition of the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. This Court has affirmed sentences of death in cases when the defendant has murdered a victim in the course of, or just after, raping that victim. *Davis*, 318 S.W.3d 618; *Dorsey*, 318 S.W.3d 648; *McLaughlin*, 265 S.W.3d 257; *State v. Kinder*, 942 S.W.2d 313 (Mo. banc 1996). The death penalty has been imposed when the jury finds the defendant acted with a depraved mind in strangling or smothering the victim to death after raping or sodomizing or attempting to rape or sodomize the victim. *State v. Brown*, 902 S.W.2d 278 (Mo. banc 1995); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981). The death penalty has been upheld in cases when the defendant

35

murdered more than one victim. *Anderson*, 306 S.W.3d 529; *Christeson*, 50 S.W.3d 251; *State v. Smith*, 32 S.W.3d 532 (Mo. banc 2000); *State v. Ringo*, 30 S.W.3d 811 (Mo. banc 2000). Finally, this Court has upheld the death sentence when the defendant murdered at least one victim and perpetrated a robbery or a burglary. *State v. Deck*, 303 S.W.3d 527 (Mo. banc 2010); *State v. Gilbert*, 103 S.W.3d 743 (Mo. banc 2003); *State v. Williams*, 97 S.W.3d 462 (Mo. banc 2003).

This Court independently researched both death and life cases and has not identified any similar case involving two brutal murders, burglary, robbery, sodomy, rape and an attempt to conceal the crimes committed that would support a finding that Driskill's sentence is disproportionate. The evidence of Driskill's guilt is overwhelming. The imposition of the death penalty meets the statutory requirements. There was no error.

### Conclusion

For the foregoing reasons, the judgment is affirmed.

_____
George W. Draper III, Judge

Russell, C.J., Fischer, Wilson and Teitelman, JJ., concur;
Breckenridge, J., dissents in separate opinion filed;
Stith, J., concurs in opinion of Breckenridge, J.



# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,     )
             )
     Respondent,  )
             )
v.            )  No.  SC93882
             )
JESSE DRISKILL,     )
             )
     Appellant.   )

## DISSENTING OPINION

I write separately because I do not agree with the majority opinion's conclusion that the record, in the light most favorable to the trial court's rulings, supports a finding that Mr. Driskill was competent to stand trial because the information in the record should have compelled the trial court to order a psychiatric examination to determine Mr. Driskill's competency.  Section 552.020.2[1] provides that "[w]henever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed," the trial court shall, either on the court's own motion or upon a motion of the state or defense counsel, order an examination of an accused by a physician, psychiatrist, or psychologist to determine the accused's fitness to proceed.  Rather than focus on the standard applicable to whether the statute compelled an examination to provide both the trial court and a reviewing court with the information necessary to evaluate Mr. Driskill's competency, the majority opinion examines whether the

---

[1] Unless otherwise indicated, all statutory references are to RSMo Supp. 2013.

record supports the trial court's finding that Mr. Driskill, in fact, was competent to proceed with trial because he had an adequate factual understanding of the legal system and process of adjudication. This misframing of the issue creates an insurmountable burden for Mr. Driskill on appeal.

The majority opinion discusses at length that the trial court chose to believe that Mr. Driskill was competent to stand trial based on the trial court's observation and questioning of Mr. Driskill in the courtroom and on an opinion of one of the two mental health experts who evaluated Mr. Driskill's competency prior to trial. It is undisputed from the record, and not challenged by Mr. Driskill, that he was competent to stand trial in that he did not have a mental condition that precluded him from understanding the legal system and the nature of the charges against him. That never was Mr. Driskill's claim of incompetency. Rather, in his requests for a competency examination during trial, he asserted that he had a mental condition that precluded him from being present in the courtroom so that he could consult with his counsel and assist with his defense.

On that issue, the majority opinion simply finds that the trial court took adequate precautions to ensure that, whenever Mr. Driskill believed he would suffer a panic attack, he was able to leave the courtroom. The opinion further holds that Mr. Driskill's absence from the courtroom during the penalty phase of trial can be explained because "a person facing a sentence of death may become uneasy; it would be illogical to not be uneasy at such a time."

The record before the trial court shows that Mr. Driskill was not suffering from the anxiety experienced by any person facing a sentence of death. The mental health history of Mr. Driskill was contained in the reports of Dr. Linda Gruenberg, a board-certified

2

psychiatrist, and Dr. Robert Fucetola, a board-certified clinical neuropsychologist, both of whom evaluated Mr. Driskill. Dr. Gruenberg's report states that Mr. Driskill had been diagnosed with bipolar disorder and generalized anxiety disorder and demonstrated symptoms of intermittent explosive disorder during his adolescence and possibly earlier.[2] The report, prepared three months before trial, also noted that Mr. Driskill had difficulty with mood and behavior – evidenced by the fact that he had experienced explosive episodes while incarcerated and in the courtroom during pretrial proceedings.

Similarly, Dr. Fucetola's report noted that Mr. Driskill's medical records include diagnoses of anxiety disorder, behavior problems, bipolar disease, chronic severe headaches, and intermittent explosive disorder. The report also contained references to Mr. Driskill's prior suicide attempt. While Dr. Fucetola opined prior to trial that Mr. Driskill was competent to stand trial, defense counsel filed an email written by Dr. Fucetola during trial to supplement his earlier opinion. Dr. Fucetola had read testimony of the deputy present at Mr. Driskill's trial and discussed with defense counsel Mr. Driskill's behavior during voir dire when Mr. Driskill asked to be removed immediately from the courtroom and, upon placement back in a jail cell, punched the wall, appeared red in the face, was crying, was rubbing his head, and then vomited. In the email, Dr. Fucetola described the "episode" as a panic attack. Dr. Fucetola called into question his prior determination of competency, stating, "During the panic attacks, and in the moments before and after attacks, I am

---

[2] Mr. Driskill has also been diagnosed with polysubstance dependence in remission while in a controlled environment and a cognitive disorder demonstrated by mild neurocognitive deficits due to multiple head traumas, chronic polysubstance abuse, and chronic migraine headaches.

3

concerned that Mr. Driskill does not have the capacity to assist you in his own defense due to his transient state of mind."

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the prosecution of a defendant who is not competent to stand trial." *State v. Anderson*, 79 S.W.3d 420, 432 (Mo. banc 2002). The failure to inquire into a defendant's mental competence when there is sufficient evidence of incompetence deprives a defendant of his or her right to a fair trial. *Pate v. Robinson*, 383 U.S. 375, 385 (1966). As the majority opinion states, a trial court "is required to initiate proceedings to investigate the competency of a defendant whenever a reasonable judge in the same situation as the trial judge would experience doubt about the defendant's competency to stand trial." *Anderson*, 79 S.W.3d at 432 (internal quotations omitted). Here, the record shows that the trial court experienced doubts about the defendant's competency to stand trial. The trial court chose the wrong path in responding to those doubts. Rather than initiate the proceedings required by section 552.020.2 and order an examination of Mr. Driskill to determine his competency, the trial court attempted to address the obvious issues raised by Mr. Driskill's behavior during trial by repeatedly questioning Mr. Driskill and his counsel and recessing the trial to give Mr. Driskill time to recover from his anxiety or panic attacks. A defendant's demeanor at trial is relevant to the ultimate determination of competence, but it cannot replace the required proceedings to fully determine competency. *See Robinson*, 383 U.S. at 386.

While the trial court's extensive accommodations may have been sufficient for Mr. Driskill to meaningfully participate in trial during the guilt phase, his condition had deteriorated significantly by the penalty phase of trial – the phase of trial that ultimately

4

resulted in Mr. Driskill being sentenced to death. The record shows that, during the penalty phase of his trial, Mr. Driskill had to interrupt the trial multiple times to leave the courtroom.[3] The first time this occurred, the trial court questioned Mr. Driskill at a recess in the midst of the state's opening statement. When addressing the issue, the trial court noted Mr. Driskill's statement to his counsel that he believed he might have "one of those episodes" like he had previously. Mr. Driskill told the trial court that he *knew* he would have such an episode – that he would "snap out." When given an offer to view the trial by closed-circuit television, Mr. Driskill declined because doing so made him feel worse. In fact, during the penalty phase of his capital trial, Mr. Driskill was absent during half of the state's opening statement, defense counsel's opening statement, the presentation of all the state's evidence, and the presentation of four out of seven of his own witnesses. At this point, Mr. Driskill no longer was able to be present in the courtroom or participate in the proceeding by closed-circuit television and communicate and advise counsel by telephone.

This record makes clear that the trial court's accommodations were no longer sufficient during the penalty phase to protect Mr. Driskill's rights. Even if Mr. Driskill was competent at the commencement of his trial, the trial court was obligated to consider subsequent "circumstances suggesting a change that would render the accused unable to meet the standard of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181 (1975).

---

[3] Mr. Driskill asked to be excused from the courtroom four times in the jury's presence. Each time, without any explanation, the jury either heard defense counsel ask if Mr. Driskill could be excused or saw Mr. Driskill leave. In particular, the jury would have observed his absence during most of the penalty phase of his trial. These events undoubtedly would have made a negative impression on the jury.

On this record, there was reasonable cause for the trial court to experience doubts regarding Mr. Driskill's mental fitness to proceed. Under section 552.020.2, the trial court should have, either on the motions made by defense counsel or on the court's own motion, ordered an examination of Mr. Driskill by a mental health professional who met the statutory criteria to evaluate Mr. Driskill's competency to proceed with trial. Under section 552.020, the trial court was authorized to order that the examination be made at such time and under such conditions as the court deemed proper. While it is a drastic remedy to grant a mistrial, it is unknown whether the required examination could have been accomplished without a mistrial. If a mistrial was necessary to determine Mr. Driskill's competency to proceed with the guilt phase of his trial, the trial court was required to grant one.

The record in Mr. Driskill's case shows that the trial court had reasonable cause to believe Mr. Driskill was not competent to stand trial, triggering the mandatory provisions of section 552.020.2 requiring the court to order an independent competency examination. I would find that its failure to do so is reversible error and remand the case to the trial court for a new penalty phase trial.

_____
PATRICIA BRECKENRIDGE, JUDGE

6