

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI, )
)
Respondent, ) WD78000
)
v. ) OPINION FILED:  May 3, 2016
)
DEREK T. HUBBARD, )
)
Appellant. )

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Justine E. Del Muro, Judge

Before Division Three:  Gary D. Witt, Presiding Judge, James E. Welsh, Judge and
Anthony Rex Gabbert, Judge

Appellant Derek T. Hubbard ("Hubbard") was convicted after a jury trial in the

Circuit Court of Jackson County of murder in the first degree, section 565.020,[1] two

counts of murder in the second degree, section 565.021, and three counts of armed

criminal action, section 571.015.  Hubbard was sentenced on the six charges to

concurrent terms of imprisonment of life without parole, life, life, life, life, and life.

Hubbard now brings two points on appeal.  In Point One, Hubbard argues the trial court

erred in overruling his motion for a competency examination.  In Point Two, Hubbard

---

[1] All statutory citations are to RSMo 2000, as updated through the 2015 Cumulative Supplement, unless otherwise indicated.

argues the court erred in overruling his objection during voir dire regarding statements made by both the State and the court that Hubbard had a choice whether or not to be present during trial. We affirm.

## Factual Background[2]

**Underlying Crime**

On November 11, 2011, 17-year-old Allen Richardson ("Allen")[3] was at home with his father and mother, Carlos Richardson ("Mr. Richardson") and Mary Richardson ("Mrs. Richardson"). Stephanie Brown ("Brown"), Mr. Richardson's cousin, and her friend Jackie Kincy ("Kincy") came to the Richardsons' home that evening, and the adults were drinking, dancing, and listening to music. At some point in the evening, Hubbard unexpectedly arrived at the Richardsons' home. Hubbard was Brown's former boyfriend. Hubbard sat next to Brown and tried to get Brown to leave with him, but she refused. Hubbard became angry and physical and got up from the couch, slammed the front door shut, and locked it. Hubbard pulled out a gun and waved it around.

The confrontation escalated, and Hubbard repeatedly hit Brown in the face with his gun. Hubbard also struck Mr. Richardson, threatened Mrs. Richardson, and struck Kincy. Hubbard demanded and took each person's cellphone and handed them to Allen to prevent anyone from dialing 911. Hubbard then stated that he was going to leave with Brown, whom he continued to strike. Mr. Richardson went to a bedroom and returned with a small jewelry chest with which he hit Hubbard. A struggle ensued that ended with

---

[2] In a criminal case we view the evidence in the light most favorable to the verdict. *State v. Perry,* 275 S.W.3d 237, 242 (Mo. banc 2009).

[3] We will refer to Allen Richardson as "Allen" to distinguish him from his parents. No familiarity or disrespect is intended by use of his first name.

Hubbard shooting Mr. Richardson in the torso. Kincy ran toward the kitchen and attempted to escape the home but could not get out the back door. Hubbard shot Brown in the head. Allen saw Hubbard shoot his mother, Mrs. Richardson, in the head as he was running toward the bathroom to hide. Allen then hid in the bathroom until he heard a door slam. When he emerged from hiding, Allen found Kincy returning from the kitchen.

When law enforcement arrived, both Brown and Mrs. Richardson were deceased. Mr. Richardson appeared to still be breathing, but by the time EMS personnel arrived, he was also deceased. Police discovered that Brown's vehicle, a red Kia, was missing from the Richardsons' home. Allen and Kincy both identified Hubbard as the shooter. Hubbard was later found driving Brown's Kia when he was taken into police custody.

**Procedural Background**

Hubbard was charged by indictment on December 2, 2011, and appointed a public defender. Hubbard sought multiple times to dismiss his counsel and proceed *pro se*. On May 7, 2013, the trial court issued an order for a mental examination regarding Hubbard's competency to stand trial and to waive his right to counsel. The report of that examination was filed with the court on September 6, 2013. That report found no evidence of psychosis or serious mental illness that would prevent Hubbard from participating in his case. Hubbard was diagnosed in the mental evaluation with personality disorder not otherwise specified and chronic dysfunction in terms of coping skills, adjusting to change, and getting along with others.

3

The court conducted a hearing and found Hubbard competent to waive his right to counsel and to represent himself. The court granted defense counsel's application to withdraw as Hubbard desired to proceed *pro se*. Two months later, Hubbard filed a motion requesting appointment of counsel, which was granted. Thereafter, Hubbard sought multiple times to have his public defender dismissed and replaced by a different attorney. Those motions were denied, and Hubbard went to trial represented by appointed counsel.

Hubbard's case first went to trial on June 23, 2014. Before the commencement of proceedings, Hubbard protested that he did not want his appointed counsel to represent him and alleged that defense co-counsel blamed Hubbard for the death of defense counsel's mother. Hubbard also claimed that his counsel was unfit to be handling the case because he was emotionally distraught by the death of his mother. In addition, Hubbard claimed that defense counsel was trying to sabotage his case, that the Kansas City Police Chief was doing things to have him tormented in jail, etc. Hubbard also claimed that he was not allowed a proper psychiatric evaluation due to his refusal to speak with the evaluators because they were hired by his attorneys.

In the course of voir dire, Hubbard began sobbing and exclaimed loudly before the venire that, among other things, "[t]hey are trying to kill me." Hubbard was escorted from the courtroom where he continued his outburst in the hall, the noise of which could still be heard in the courtroom. Defense counsel moved for a mistrial, which was initially denied by the trial court because the trial court believed Hubbard was intentionally trying

4

to sabotage his trial. After further voir dire was conducted regarding what the jury saw and heard of the outburst, the court granted the mistrial.

Hubbard's case again went to trial on June 24, 2014. Prior to proceeding, Hubbard's defense counsel sought a continuance for a mental evaluation, which was denied by the trial court. The trial court noted that the case had been pending since 2011 and Hubbard had already been given four or five continuances, multiple of which were for the purpose of allowing the defense to procure a mental examination. During voir dire, Hubbard again had a loud outburst in which he launched toward his counsel and both men fell to the ground. Hubbard had to be restrained by deputies and continued to yell out statements regarding a conspiracy, the Ku Klux Klan, the Kansas City Chief of Police, and other allegations. The trial court again granted a mistrial and informed Hubbard that he was being sent back to the jail and the trial would proceed without his presence due to his refusal to act appropriately.

On June 30, 2014, trial began for a third time with a third venire. The trial court again denied Hubbard's request for an additional continuance for a mental evaluation. The trial court offered to let Hubbard observe the trial via a TV monitor in another courtroom with co-counsel. In addition, the court offered to allow texting, so that Hubbard would have real time communication with his attorney in the courtroom. Hubbard refused this arrangement, and the trial court let the offer stand in case he changed his mind during the trial. Prior to voir dire, the court, the State, and defense counsel discussed how to address with the jury Hubbard's failure to appear in the courtroom. During voir dire, the State inquired whether the venire panel would be

5

bothered by the fact that Hubbard would not be present in the courtroom and questioned the venire panel accordingly. Juror No. 5 asked whether the jury would know why Hubbard would not be in the courtroom. The prosecutor responded that she could not tell the jury why. Later, juror No. 5 inquired, "[h]e's got a choice right? If he wants to be here to defend himself, right?" The trial court responded, "[t]he answer is yes." The prosecutor also responded, "[y]es. And he has attorneys who represent his interest - who are present and who will be representing his interest." There was no objection made by defense counsel to these responses.

The State then asked juror No. 5 whether the fact that Hubbard would not be physically present meant that he could not make a determination as to whether Hubbard was guilty or not guilty. The juror again inquired whether it was Hubbard's choice to be present. The prosecutor again responded "[y]es. The fact that I answered Juror Number 5's question, he has a choice; his interests are represented by the attorneys." Defense counsel then objected because the answers made it sound as if Hubbard had a choice whether to be in the courtroom. The trial court informed the defense that it was Hubbard's choice whether to be present in the courtroom and his actions and outbursts had demonstrated he had made a choice not to be present. The objection was overruled.

The next day, before the jury arrived, Hubbard was brought inside the courtroom where the court informed him that the court had arranged for him to view the proceedings remotely. Hubbard began to fight, kick, and scream and had to again be subdued by officers. Hubbard ultimately refused to participate in the trial remotely, and the trial court refused to let him participate in person, based on his behavior.

6

The jury was instructed prior to closing arguments that "no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant was not physically present at trial." The jury found Hubbard guilty of murder in the first degree, two counts of murder in the second degree, and three counts of armed criminal action. Hubbard now appeals.

## Analysis

### Point One

In Point One on appeal, Hubbard argues the trial court erred in denying defense counsel's motion for a competency examination following Hubbard's outbursts before trial because a reasonable judge in the same situation would have experienced doubt as to Hubbard's ability to consult with his lawyers with a reasonable degree of rational understanding and to possess a rational as well as factual understanding of the proceedings against him.

A trial court must initiate proceedings to investigate a defendant's competency "whenever a reasonable judge in the same situation as the trial judge would experience doubt about the defendant's competency to stand trial." *State v. Driskill*, 459 S.W.3d 412, 423 (Mo. banc 2015) (quoting *State v. Anderson*, 79 S.W.3d 420, 432 (Mo. banc 2002)). "A trial court's determination regarding a defendant's competency is a factual determination that will be upheld unless there is no substantial evidence to support it." *Id.* A defendant is competent to stand trial where he has the "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a

7

rational as well as factual understanding of the proceedings against him [or her].'" *Id.* (quoting *Zink v. State*, 278 S.W.3d 170, 183 (Mo. banc 2009)).

"When reviewing the trial court's determination, this Court does not weigh the evidence, but accepts as true all evidence and reasonable inferences that tend to support the trial court's findings." *Id.* at 424; *see also State v. Elam*, 89 S.W.3d 517, 521 (Mo. App. W.D. 2002). The defendant is presumed to be competent to stand trial and bears the burden of showing that he is incompetent. *See* Section 552.020.8; *Driskill*, 459 S.W.3d at 424. "The trial court has broad discretion in deciding whether to grant a psychological exam, and is not a mere 'automaton' that must grant these motions merely because they are filed." *Driskill*, 459 S.W.3d at 424 (quoting *State v. Bracken*, 382 S.W.3d 206, 212 (Mo. App. E.D. 2012)).

The trial court did not abuse its discretion in denying Hubbard's request for another continuance and another mental examination. As detailed above, the trial court ordered, pursuant to section 552, that Hubbard be examined regarding his competency to stand trial in May of 2013. That exam was filed with the trial court in September of 2013. The mental examination found Hubbard's

> [h]istory of mental health occurred with one incident at the age of 15 and he provided no details to the medical examiners about that event. No other medical records or reports were provided to the evaluator. They said that he has no evidence of psychosis or serious mental illness that would prevent him from presenting a case, his case. They said that his negative perceptions were not the result of any delusions. His diagnosis was personality disorder not otherwise specified. Pervasive and chronic dysfunction in terms of coping skills, adjusting to change, and getting along with others [ . . . . ]

8

The conclusion of the report was that Hubbard was competent to stand trial. It does not appear from the record that the findings of this mental examination were ever contested. Defense counsel was permitted by the trial court to obtain additional mental evaluation(s). The results of this or these additional evaluations were never offered to the trial court.

After defense counsel again requested a new mental evaluation one year later, after Hubbard's outbursts before trial, the court denied the request and found that the conclusions of Hubbard's mental examination were "consistent with the behavior we saw. He does not cope well. He does not adjust well to change. And he clearly has difficulty getting along with others. And I think that's what we witnessed both on Monday and Tuesday of this week." The trial court noted its own observation that Hubbard had been in the courtroom multiple times and attended case management conferences, where he behaved appropriately and was polite and deferential. However, the moment he realized that a jury was about to be picked, Hubbard began to create chaos. According to the court, this behavior had occurred two days in a row and was not consistent with mental illness but rather consistent with someone who does not want to go to trial. The trial court also noted that Hubbard's behaviors were consistent with what the previous judge assigned to the case had warned the trial court may happen.[4]

---

[4] Hubbard argues that a reasonable judge would not rely on the hearsay reports of another judge when making a determination regarding competency. Hubbard did not object when the trial court explained that Hubbard's behavior was consistent with the observations of the judge previously assigned to the case. Given that the trial court merely noted that its observations of Hubbard were consistent with the observations of the judge previously assigned to the case, it does not undermine the trial court's determination here, based on the totality of the evidence before the court, that Hubbard had not met his burden to show that he was incompetent to proceed.

The court also noted that multiple prior trial settings had been continued to allow the defense to procure its own mental examination(s). The trial court did not have access to the additional private mental evaluations and had no authority to order the defense to divulge those results. The court inferred that the additional mental evaluations had not found Hubbard incompetent. Had those evaluations found Hubbard incompetent, the trial court reasoned, defense counsel would have surely submitted them to the court. The court found Hubbard's acting out was an intentional tactic employed by him to delay trial.

Pursuant to this Court's standard of review we accept as true the evidence and reasonable inferences that support the trial court's findings and grant the trial court broad discretion in deciding whether to grant a psychological exam. *Driskill*, 459 S.W.3d at 423-24. The only mental examination provided to the trial court found Hubbard competent to stand trial. It does not appear that Hubbard ever attempted to contest the findings of this mental evaluation, pursuant to section 552. It was a reasonable inference that the subsequent private mental evaluation(s) obtained by the defense and not provided to the trial court did not conclude that Hubbard was incompetent. There was no evidence from any mental health expert suggesting that Hubbard was incompetent.

The trial court found based on its observations that Hubbard was deliberately acting out and demonstrating behavior consistent with the mental evaluation provided to the court that had found him competent to stand trial. This finding was reasonable and supported by the evidence before the court. Given that Hubbard is presumed to be competent and it is his burden to show he is incompetent, we cannot say the trial court

abused its discretion in denying his motion for yet another mental examination at this late date.

Point One is denied.

## Point Two

In Point Two on appeal, Hubbard argues the trial court erred and abused its discretion in overruling his objection during voir dire relating to the State's statement that Hubbard had a choice whether to be present during trial. Hubbard also argues that the trial court plainly erred in making its own statement to the jury that Hubbard had a choice whether to be present during trial.

Contrary to Hubbard's assertion on appeal, he has failed to preserve for appellate review his claim of error regarding the State's assertion that Hubbard had a choice to be present for trial. In order to preserve an objection to statements made during voir dire, the defendant must raise a timely objection. *Pollard v. Whitener*, 965 S.W.2d 281, 289 (Mo. App. W.D. 1998); *St. Louis Cty. v. Seibert*, 634 S.W.2d 590, 592-93 (Mo. App. E.D. 1982). Hubbard failed to raise any objection when the trial court and the State first told the jury, in response to questions by a member of the venire panel, that Hubbard had a choice whether to be present at trial. Only later when the issue was revisited did defense counsel object to the way the question was being answered. Prior to defense counsel's objection, the jury had already been informed multiple times that Hubbard had the choice to be present at trial. In addition, Hubbard concedes that he made no objection to the trial court's statement that Hubbard had the choice whether to be present at trial. We find that

11

counsel's objection to these statements was untimely and the claim is not preserved for appellate review.

Accordingly, this Court may only review the claims for plain error pursuant to Rule 30.20.

> Rule 30.20 authorizes this Court to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995) (quoting Rule 30.20). If not, we should not exercise our discretion to conduct a Rule 30.20 plain error review. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. [*State v. Baumruk,* 280 S.W.3d 600, 607 (Mo. banc 2009)]. "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious and clear." *Id.* (citations and internal quotation marks omitted). In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* at 607–08.

*State v. Flores,* 437 S.W.3d 779, 789 (Mo. App. W.D. 2014).

Hubbard claims that the statements were improper because he did not have a choice whether to be present at trial. Hubbard argues that the statements by the court and the State that Hubbard had the choice to be present at trial and his failure to be present would cause the jury to make a negative inference: specifically, the negative inference that Hubbard chose not to be present at trial because he had done something bad and wanted to hide it from the jury.

12

We find that Hubbard's claim fails to facially establish substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted and, therefore, decline plain error review. First, the statements by the State and the court were accurate. The trial court gave Hubbard multiple opportunities to conform his behavior to what is expected and appropriate before the trial court and to attend the trial. Hubbard refused to so conform and, as found by the trial court, was acting out for the purpose of delaying trial. It was Hubbard's intentional behavior which caused him to be removed from the courtroom and, if he had chosen to conform his behavior, he would have been allowed to be present in the courtroom. He showed that he had the ability to conform his behavior during multiple pretrial hearings. It was Hubbard's choice to behave is a disruptive manner, and the trial court informed him of the consequences of his disruptive behavior. Therefore, the statements were not improper.

Further, assuming *arguendo* that the statements cited by Hubbard were improper, Hubbard cannot establish he was prejudiced by the admission of these statements. The jury was questioned during voir dire regarding the effect of Hubbard's absence from trial and the jury instructions informed them that Hubbard's absence from trial was not evidence of guilt and no inferences could be made as a result of his absence. During voir dire, the jury was asked whether they disagreed with the statements that "[t]he fact the defendant is not present in the courtroom is not evidence" and that it "is not evidence of his guilt" and "not evidence of his innocence." No one seated on the jury disagreed with these statements or expressed discomfort with applying this to the trial. The instruction submitted to the jury, Instruction No. 28 stated:

13

Under the law, a defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify. Further, *no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant was not physically present at trial.*

(emphasis added).

"In the absence of exceptional circumstances, we assume the jury obeyed the trial court's directions and followed its instructions." *Christian v. State*, 455 S.W.3d 523, 528 (Mo. App. W.D. 2015) (quoting *Boone v. State*, 147 S.W.3d 801, 808 (Mo. App. E.D. 2004)); *see also, e.g., State v. Forrest*, 183 S.W.3d 218, 229 (Mo. banc 2006). Given that the jury was properly instructed that it could not make a presumption of guilt or raise *any inference* regarding his absence from the courtroom, Hubbard could not have been prejudiced by the challenged statements. We find no exceptional circumstances here to disregard the assumption that the jury followed the instructions. Accordingly, Hubbard has not and cannot establish substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted.[5] We, therefore, decline plain error review. We find the trial court bent over backwards to accommodate Hubbard and see that his rights to a fair trial were protected.

Point Two is denied.

---

[5] In addition, considering the substantial evidence of Hubbard's guilt, including two eyewitnesses who knew Hubbard and who saw Hubbard shoot the victims and Hubbard's apprehension by police driving one of the victim's vehicle, it is, to say the least, unlikely that these statements to the jury regarding Hubbard's absence from the courtroom would have had any impact on the jury's finding of guilt.

14

## Conclusion

The judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur