SUPREME COURT OF MISSOURI
 en banc
IN THE INTEREST OF J.A.T., ) Opinion issued January 11, 2022
 )
 Appellant, )
 )
v. ) No. SC99251
 )
JACKSON COUNTY JUVENILE )
OFFICE, )
 Respondent. )

 APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
 The Honorable Jalilah Otto, Judge

 The Jackson County circuit court found J.A.T. committed acts that would

constitute first-degree assault and armed criminal action if committed by an adult. J.A.T.

appeals, arguing the circuit court erred in requiring J.A.T. to participate in the

adjudication hearing via two-way video because it violated J.A.T.'s rights to due process

and confrontation under the United States Constitution and the Missouri Constitution.

The circuit court's judgment is vacated, and the case is remanded.

 Facts and Procedural History

 The Jackson County juvenile officer filed a petition alleging J.A.T. committed acts

that would constitute first-degree assault, first-degree attempted robbery, and two counts

of armed criminal action if committed by an adult. The juvenile officer alleged J.A.T.
committed the acts personally, or with an accomplice for whom J.A.T. would be

criminally responsible, and knowingly caused serious physical injury to the alleged

victim, Dalvon Stiner, by shooting him multiple times.

 The adjudication hearing was continued multiple times by J.A.T. and the circuit

court. 1 Prior to the adjudication hearing, J.A.T. filed an "Objection to Adjudication by

Video" and argued J.A.T. had a right under the United States Constitution, the Missouri

Constitution, and Missouri statute to be adjudicated in person and to confront adverse

witnesses in person. At a pretrial conference, which occurred via two-way video

conferencing, J.A.T. objected to proceeding with the adjudication hearing "in this fashion

on video" based on the previously filed "Objection to Adjudication by Video." The

circuit court noted the juvenile officer had not yet filed a response to that objection, and

stated: "We don't know what the condition of things, public health-wise will be on [the

adjudication hearing date]. . . . I have looked at the request that you're making, but at this

time I'm not going to rule on it until closer to [the adjudication hearing date]." The

juvenile officer filed a "Response to Juvenile's Objection to Adjudication by Video" and

argued a two-way video hearing would protect J.A.T.'s constitutional rights and it was

appropriate due to the COVID-19 pandemic.

 The circuit court conducted the adjudication hearing, requiring J.A.T. to

participate via two-way live video from the juvenile detention facility. Only J.A.T.

1
 The circuit court continued the adjudication hearing once on its own order "due to compelling
and extenuating circumstances which include public health concerns related to the ongoing
pandemic."

 2
appeared by two-way video. 2 The circuit judge, J.A.T.'s attorney, the juvenile officer's

attorney, a deputy juvenile officer, a victim services representative, J.A.T.'s parents, and

the witnesses appeared in person at the hearing. J.A.T. renewed the objection to the

circuit court requiring J.A.T. to attend via two-way video. The circuit court overruled the

objection and stated its reasoning for doing so:

 And just I think I've said this before or not in this case, but I have in
 other cases. In the times of the pandemic, of the coronavirus and
 COVID-19, we've had to make a number of significant adjustments to how
 we do things in court.
 One of them is utilizing the Webex technology, which the [Missouri]
 Supreme Court has explicitly given us permission to do so. That coupled
 with the fact that there have been numerous detention facilities who have
 had difficulty maintaining—or not maintaining, keeping COVID-19 out of
 their facilities. Our facility has done a great job of doing that. We want to
 keep doing that.
 One of the policies being put in place by the detention center of the
 Family Court is that the juveniles will not be transported to and from court
 to limit the exposure to germs of that particular juvenile as well as
 additional juveniles in detention. The Court believes that's reasonable for
 them to make such a policy. It's reasonable for the Court to follow it. 3
 Furthermore, following the Webex procedure as outlined by the
 [Missouri] Supreme Court, I don't believe, violates [J.A.T.'s] due process
 rights in any way. For that reason, I will deny your request to have [J.A.T.]
 here in person.

(Footnote added).

 Contrary to the circuit court's statements, this Court was careful to ensure its order

incorporating the operational directives would not be interpreted to permit the violation
2
 An intern for J.A.T.'s attorney was present in the detention facility with J.A.T. during the
adjudication hearing. J.A.T.'s attorney also relocated to the detention facility during a recess in
the hearing and presented closing argument from the detention facility with J.A.T. via two-way
video.
3
 Exhibit A, Supreme Court of Missouri en banc, In re: Operation Directives for Easing
COVID-19 Restrictions on In-Person Proceedings (May 4, 2020); Exhibit B, Circuit Court of
Jackson County, Missouri, 16th Judicial Circuit, In Re: Updated Court Operations upon Re-
Opening of Courthouses Administrative Order 2020-084 (May 14, 2020).

 3
of a juvenile's constitutional or statutory rights. Whether a hearing was required to be

held during a pandemic—or continued until a hearing could be held safely—is a different

issue than whether the law requires a hearing to be held in person and the juvenile and the

witnesses be required to appear face-to-face. Once a circuit court determines an

adjudication hearing must be held, nothing in this Court's Operational Directives

expressly permit prohibiting the accused juvenile from appearing in person if he objects

to appearing remotely.

 This Court's Operational Directives, entered May 4, 2020, specifically provided

that "[p]roceedings pursuant to chapters 210 and 211 pertaining to juvenile

delinquency" were excluded from the provisions allowing for remote proceedings.

In re: Operation Directives, supra note 3 at C(2) (emphasis added). After listing that

exception and other exceptions, this Court directed:

 Courts may set in-person hearings in the above listed proceedings but it
 does not mandate a judge set a hearing in any individual case. The
 presiding judge of each circuit court and the chief judges of each appellate
 court are authorized to determine the manner in which the listed in-person
 exceptions are to be conducted. Such proceedings shall be limited to the
 attorneys, parties, witnesses, security officers, and other individuals
 necessary to the proceedings as determined by the judge presiding over
 the proceedings. The judge presiding over such proceedings has the
 discretion to excuse jurors or other individuals who cannot or should not
 appear as a result of risks associated with COVID-19.

Id. (emphasis added).

 This Court specifically cautioned about the requirement for in-person proceedings

in delinquency adjudications. Id. This Court gave circuit court presiding judges the

discretion to determine the manner of in-person proceedings. Id. But this Court

 4
specifically provided that parties, attorneys, and witnesses were among the people who

are physically present at in-person proceedings. See id. Nothing in this Court's directives

encouraging remote proceedings for many types of hearings supports the circuit court's

determination that remote proceedings were authorized in this case irrespective of the

juvenile's statutory and constitutional rights. In other words, nothing in this Court's

directives permitted the circuit court to deny J.A.T.'s request to appear in-person and

proceed over his objection at the adjudication hearing.

 The juvenile officer presented testimony of Stiner and the police detective, Kaitlyn

Elias, who investigated the incident. Stiner testified he was contacted on Snapchat by an

individual who asked to purchase marijuana from him. Stiner and the individual agreed

on a plan for the marijuana purchase. Upon arriving at the designated meeting spot, two

individuals—both with money visible—approached Stiner in his car. Stiner took the

money, and the two individuals got into Stiner's car. One individual sat in the front

passenger seat and one individual sat in the back seat. The back seat passenger was

armed with a firearm. The individuals asked Stiner to divide the marijuana, and Stiner

testified he felt rushed. A struggle occurred that involved the front seat passenger

reaching for something within the car. Stiner testified he was then shot six times by the

back seat passenger and blacked out. When Stiner woke up, he first called a friend, and

then called the police. Stiner was taken to the hospital, where he required surgery. Stiner

testified he was armed with a firearm on his left side that night; however, he never pulled

out the weapon. Stiner also testified the two individuals did not take the marijuana,

firearm, or other belongings in the car.

 5
 Detective Elias testified she responded to the scene to investigate the shooting and

found five .45-caliber shell casings, two .40-caliber shell casings, a bullet fragment, a

firearm, a .45-caliber magazine, and 18 grams of marijuana. The firearm was reported as

stolen, and Detective Elias testified Stiner possessed the firearm on the night of the

shooting. Detective Elias testified there was no evidence the shooting occurred outside

the vehicle. Detective Elias spoke to Stiner the day after the shooting and testified Stiner

described two suspects, 14 to 16 years old, and 5'5" to 5'6" in height. Stiner also

provided the Snapchat account name of the person he arranged to meet with that night.

 Detective Elias applied for a search warrant from Snapchat for the

communications between Stiner and the individual who contacted him to purchase

marijuana. Detective Elias, with assistance of the school district, searched for names in

connection with the Snapchat user name. This led Detective Elias to J.A.T. and J.A.T.'s

address, which was in close proximity to the shooting location. Detective Elias compiled

a photographic lineup; Stiner identified J.A.T. as the front seat passenger, and another

individual as the back seat passenger. In connection to the Snapchat warrant, Detective

Elias described a video that showed J.A.T. holding a firearm, which was time-stamped

"just prior" to Stiner's call to police on the night of the incident. The video showed J.A.T.

wave the barrel of the firearm in front of the camera, where "distinct X mark

ammunition" can be seen loaded in the chamber of the firearm. Detective Elias testified

that DNA was recovered from multiple locations in Stiner's vehicle, including the

passenger door handle, the firearm magazine, and the interior of the rear passenger door,

 6
and none of that DNA matched J.A.T. Detective Elias also testified a search warrant was

executed on J.A.T.'s home, and no firearms were found in the home.

 In addition to the testimony of the two witnesses, the juvenile officer admitted into

evidence a .45-caliber bullet, multiple crime scene photos depicting Stiner's vehicle, the

search warrant for information from Snapchat, multiple booking photographs used for the

lineup, and the photographic lineup presented to Stiner.

 J.A.T. filed a motion for judgment of acquittal at the close of the juvenile officer's

evidence, which the circuit court denied. J.A.T.'s attorney then requested to go to the

detention facility to speak to J.A.T., ultimately deciding to present no additional

evidence. J.A.T. filed another motion for judgment of acquittal at the close of all

evidence, which the circuit court also denied. The juvenile officer presented closing

argument in person, and J.A.T. presented closing argument from the detention facility via

two-way video.

 The circuit court sustained the allegations of first-degree assault and armed

criminal action relating to the assault, beyond a reasonable doubt. The circuit court did

not sustain the allegations of first-degree attempted robbery and armed criminal action

relating to the attempted robbery. After a dispositional hearing, the circuit court ordered

J.A.T. be committed to the custody of the Division of Youth Services. J.A.T. appealed;

the court of appeals issued an opinion but then transferred the case to this Court pursuant

to Rule 83.02. This Court has jurisdiction pursuant to article V, § 10 of the Missouri

Constitution.

 7
 Standard of Review

 "Juvenile proceedings are reviewed in the same manner as other court-tried cases."

D.C.M. v. Pemiscot Cnty Juv. Off., 578 S.W.3d 776, 786 (Mo. banc 2019) (internal

quotations omitted). "This Court will affirm a judgment in a juvenile proceeding unless it

is not supported by evidence, is against the weight of evidence, or erroneously declares or

applies the law." Id. Whether a person's constitutional rights were violated is a question

of law that this Court reviews de novo. State v. Justus, 205 S.W.3d 872, 878 (Mo. banc

2006). Properly preserved constitutional violations are presumed prejudicial. Id. at 881.

"[T]he constitutional protections applicable in criminal proceedings are also applicable in

juvenile delinquency proceedings due to the possibility of a deprivation of liberty

equivalent to criminal incarceration." In re N.D.C., 229 S.W.3d 602, 605 (Mo. banc

2007).

 Analysis

 J.A.T. argues requiring him to attend the adjudication hearing via two-way live

video violated his rights to due process and confrontation under the United States

Constitution, U.S. Const. amends. VI, XIV; the Missouri Constitution, Mo. Const. art. I,

§§ 10, 18(a); and Supreme Court of Missouri Rule 128. J.A.T. properly preserved this

issue for appeal by objecting to virtual adjudication before and during the adjudication

hearing.

 The Fourteenth Amendment's due process protection applies to juvenile

proceedings. In re Gault, 387 U.S. 1, 30-31 (1967), overruled on other grounds by Allen

v. Illinois, 478 U.S. 364, 372-73 (1986). The Fourteenth Amendment states "[n]o State

 8
shall . . . deprive any person of life, liberty, or property, without due process of law[.]"

U.S. Const. amend. XIV, § 1. Due process requires application during a juvenile

adjudication hearing of "the essentials of due process and fair treatment." Gault, 387

U.S. at 30. The United States Supreme Court has held certain rights enumerated within

the Bill of Rights apply to juvenile proceedings, including notice of charges, right to

counsel, right of confrontation and cross-examination, and privilege against

self-incrimination. Id. at 33, 41, 55, 56.

 "One of the most basic of the rights guaranteed by the Confrontation Clause is the

accused's right to be present in the courtroom at every stage of his trial." Illinois v. Allen,

397 U.S. 337, 338 (1970). "[A] person cannot incur the loss of liberty for an offense

without notice and a meaningful opportunity to defend." State v. Miller, 372 S.W.3d 455,

467 (Mo. banc 2012) (alteration in original). "The right to be present at critical stages of

trial is guaranteed by the United States Constitution, the Missouri Constitution, and

Missouri statutory law." State v. Johns, 34 S.W.3d 93, 116 (Mo. banc 2000). 4

 "[T]he juvenile and the juvenile's parents, guardian or custodian shall have the

right to be present at all times during any hearing." Rule 128.01a; "No hearing . . . may

be commenced without the presence of the juvenile unless the juvenile's presence is

waived by counsel; provided, a detention hearing . . . may be commenced without the

presence of the juvenile if the juvenile's presence is waived by the juvenile's counsel or

4
 See also Mo. Const. art. I § 18(a) ("[I]n criminal prosecutions the accused shall have the right
to appear and defend, in person and by counsel[.]"); § 546.030, RSMo 2016 ("No person indicted
for a felony can be tried unless he be personally present, during the trial[.]"); Rule 31.03(a) ("No
trial shall be conducted . . . unless the defendant is present[.]"); Fed. R. Crim. P. 43(a)(2) ("[T]he
defendant must be present at: every trial stage[.]").

 9
the court determines the juvenile's presence is not warranted." Rule 128.01b. The circuit

court may continue with a hearing upon the "subsequent voluntary absence of the

juvenile." Rule 128.01c. The circuit court may also "exclude any unruly or disruptive

person from a hearing where exclusion is necessary to the orderly conduct of the

hearing." Rule 128.01g. At a juvenile adjudication hearing, "[a]ll parties shall be

afforded the opportunity to testify, present evidence, cross-examine witnesses, and

present arguments of law and fact and arguments concerning the weight, credibility and

effect of the evidence." Rule 128.02b.

 A defendant has a "due process right to be present at a proceeding whenever his

presence has a relation, reasonably substantial, to the fulness of his opportunity to defend

against the charge." United States v. Gagnon, 470 U.S. 522, 526 (1985) (internal

quotations omitted). "[T]he presence of a defendant is a condition of due process to the

extent that a fair and just hearing would be thwarted by his absence, and to that extent

only." Id. (alteration in original). "The focus is whether, on the whole record, the

defendant could have done or gained anything by attending." State v. Middleton, 998

S.W.2d 520, 526 (Mo. banc 1999); see also Kentucky v. Stincer, 482 U.S. 730, 745-46

(1987) (holding the defendant's due process rights were not violated by his exclusion

from the competency hearing of two witnesses against him because "[n]o question

regarding the substantive testimony that the two girls would have given during the trial

was asked at that hearing." But noting "a competency hearing in which a witness is

asked to discuss upcoming substantive testimony might bear a substantial relationship to

a defendant's opportunity better to defend himself at trial."). "[A] defendant is

 10
guaranteed the right to be present at any stage of the criminal proceeding that is critical to

its outcome if his presence would contribute to the fairness of the procedure." Stincer,

482 U.S. at 745.

 The right to be present, however, can be lost either involuntarily or voluntarily.

 [A] defendant can lose his right to be present at trial if, after he has been
 warned by the judge that he will be removed if he continues his disruptive
 behavior, he nevertheless insists on conducting himself in a manner so
 disorderly, disruptive, and disrespectful of the court that his trial cannot be
 carried on with him in the courtroom.

Allen, 397 U.S. at 343. "Once lost, the right to be present can, of course, be reclaimed as

soon as the defendant is willing to conduct himself consistently with the decorum and

respect inherent in the concept of courts and judicial proceedings." Id. A defendant may

also waive his right to be present at trial. State v. Driskill, 459 S.W.3d 412, 426 (Mo.

banc 2015). "When a defendant choses [sic] to waive a constitutional right, the waiver

must be voluntarily, knowingly, and intelligently made." Id. "In the absence of evidence

to the contrary, the defendant's purposeful absence from the courtroom creates the

presumption of a valid waiver." Johns, 34 S.W.3d at 116. "A defendant can waive his

right to be present at all critical stages of his or her trial by voluntarily and willfully

leaving the courtroom." State v. Knese, 985 S.W.2d 759, 776 (Mo. banc 1999).

 In the case at bar, J.A.T. repeatedly asserted his right to be physically present at

his adjudication hearing to defend himself. By requiring J.A.T. to attend his own

adjudication hearing via two-way video, the circuit court denied him the crucial right to

be physically present at the stage of the proceedings critical to its outcome—the

determination of guilt or innocence. This exclusion, with no fault being attributed to

 11
J.A.T., contributed to the fairness of these proceedings because the adjudication hearing

was J.A.T.'s opportunity to defend against the accusations of the juvenile officer. The

circuit court's general reference to the policy of the detention facility to not transport

juveniles to and from court "to limit the exposure to germs of that particular juvenile as

well as juveniles in detention" during the COVID-19 pandemic does not in and of itself

justify the denial of J.A.T.'s right to be present at this most critical stage of his

proceeding.

 The purported necessity of prohibiting J.A.T. from being transported to the

hearing from the detention facility for his own protection and for the protection of other

juveniles at the detention facility is undercut by the fact that defense counsel was

permitted to go to the facility and complete the hearing with J.A.T. after defense counsel

had been present in the courtroom with the circuit judge, the circuit judge's staff, J.A.T.'s

parents, the juvenile officer, a deputy juvenile officer, a victim services representative,

and all the witnesses. Presumably the circuit court found the safety measures in place in

the courtroom to be sufficiently protective to permit several individuals to be present.

 Furthermore, nothing in this Court's Operational Directives granted permission to

conduct J.A.T.'s adjudication hearing with J.A.T. appearing via two-way video from the

detention facility. This Court's COVID Operational Directives outlined phases of

operation for Missouri courts to follow to gradually resume in-person appearances and

proceedings. In re: Operation Directives, supra note 3. Each phase authorized resuming

certain in-person proceedings and appearances, upon the order of the presiding judge or

chief judge of the applicable circuit, based on findings of specific "Gateway Criteria."

 12
Id. at A-B. The "Gateway Criteria" outlined considerations "before resuming court

activity or progressing to a new Operating Phase." Id. at A. The Sixteenth Circuit

entered its order in response to this Court's order: "The Court will follow the Operational

Directives and criteria set forth by the Missouri Supreme Court." In Re: Updated Court

Operations, supra note 3 at pg. 2.

 Throughout the pandemic, this Court's orders have excepted from in-person

proceedings that could be suspended "[p]roceedings necessary to protect the

constitutional rights of criminal defendants." In re: Operation Directives, supra note

3 at C(2) (emphasis added). In all phases of operation, this Court's order contained a

"Gateway Criteria" providing: "Encourage judges and court staff to continue utilizing all

available technologies – including teleconferencing and video conferencing – whenever

possible to limit in-person courtroom appearances to the extent not prohibited by

constitutional or statutory provisions." Id. at C(4), D(5), E(5), F(5) (emphasis added)

(operating phase two and operating phase three contain slightly different language). The

Sixteenth Circuit's order similarly provided: "Whereas, the Missouri Supreme Court has

continued to encourage judges to utilize all available technologies – including

teleconferencing and video conferencing – to limit in person courtroom appearances

to the extent not prohibited by the constitution or statutes as to the proceedings[.]"

In Re: Updated Court Operations, supra note 3 at pg. 2 (emphasis added).

 Operating phase zero of this Court's order, the most stringent phase of operation,

suspended all in-person proceedings, subject to exceptions, which included:

"Proceedings pursuant to chapters 210 and 211 pertaining to juvenile

 13
delinquency[.]" In re: Operation Directives, supra note 3 at C(2) (emphasis added).

The Sixteenth Circuit's order also specifically addressed juvenile proceedings:

 The Court Administrator/Deputy Court Administrator may resume
 programming operated by the Family Court Services, provided however,
 that the resumption of said programming can proceed in compliance with
 the Operational Directives, social distancing requirements, limitations on
 size of gatherings, other terms of this Administrative Order and guidelines
 of the Centers for Disease Control and Prevention.

In Re: Updated Court Operations, supra note 3 at pg. 4 (emphasis in original).

 In addition to the circuit court's violation of J.A.T.'s constitutional right to due

process as discussed previously by requiring J.A.T.'s attendance via two-way video over

objection, the circuit court also failed to heed the caution of this Court's order, which was

drafted to ensure the constitutional and statutory rights of juveniles were protected during

the COVID-19 pandemic.

 Conclusion

 Neither the United States Constitution nor the Missouri Constitution are entitled to

take "sick days." This Court recognizes the devastating toll the COVID-19 pandemic has

taken in this country and our state, and the substantial impact the pandemic has had on all

aspects of society. Nevertheless, generalized concerns about the virus may not override

an individual's constitutional right of due process to be physically present for his juvenile

adjudication hearing at which his guilt or innocence will be determined. 5

5
 Because this case is remanded for further proceedings not inconsistent with this opinion, it is
not necessary to address J.A.T.'s claims that his rights to confrontation pursuant to the United
States and Missouri Constitutions were also violated by being prohibited from being physically
present at his adjudication hearing.

 14
 The circuit court erroneously declared and applied the law in requiring J.A.T.'s

attendance and participation via two-way video in violation of J.A.T.'s due process right

to be physically present at his adjudication hearing. The court's judgment is vacated, and

the case is remanded for further proceedings consistent with this opinion.

 ___________________________
 Zel M. Fischer, Judge

Wilson, C.J., Russell, Breckenridge,
Ransom and Draper, JJ., concur;
Powell, J., concurs in separate opinion filed;
Ransom and Draper, JJ., concur in opinion
of Powell, J.

 15
 SUPREME COURT OF MISSOURI
 en banc

IN THE INTEREST OF J.A.T., )
 )
 Appellant, )
 )
v. ) No. SC99251
 )
JACKSON COUNTY JUVENILE )
OFFICE, )
 Respondent. )

 CONCURRING OPINION

 I concur with the principal opinion that the circuit court violated J.A.T.’s due

process rights by restricting J.A.T.’ s physical attendance and participation at J.A.T.’s

juvenile adjudication hearing. I write separately to caution that this holding should not be

construed too broadly.

 As the principal opinion notes “the presence of a defendant is a condition of due

process to the extent that a fair and just hearing would be thwarted by his absence,

and to that extent only.” United States v. Gagnon, 470 U.S. 522, 526 (1985) (emphasis

added) (alteration omitted). Circumstances could arise, then, in which a court may conduct

a fair and just hearing in the defendant’s absence. See Snyder v. Com. Of Mass., 291 U.S.

97 (1934), overruled on other grounds by Malloy v. Hogan, 378 U.S.1 (1964). In fact, this
Court has previously held a defendant’s brief absence during part of his criminal trial did

not result in a due process violation. See State v. Grate, 68 Mo. 22, 26-27 (Mo. 1878)

(finding no due process violation when a defendant was momentarily out of court during

closing arguments because no facts indicated prejudice as a result of the absence),

overruled on other grounds by Roe v. Bank of Versailles, 67 S.W.303, 306 (Mo 1902).

 To be sure, the circumstances justifying limiting, restricting, or denying a

defendant’s physical access to his or her trial would be highly unusual and extraordinary.

But as long as the trial or proceeding is conducted in a manner that ensures a fair and just

hearing for the defendant, the exclusion would not per se violate due process. Here, the

circumstances surrounding the adjudication proceeding did not justify excluding J.A.T.

from the hearing as the circuit court could have taken other measures to ensure J.A.T.’s

safe presence in the courtroom. Because J.A.T. could not easily confer with counsel and

be present in the courtroom to observe the proceedings and witnesses that testified, J.A.T.

was prejudiced and did not receive a fair and just hearing as the principal opinion correctly

concludes. Therefore, I concur.

 ___________________
 W. Brent Powell, Judge

 2
 SUPREME COURT OF MISSOURI
 en banc
 May 4, 2020
 Effective May 16, 2020

 OPERATIONAL DIRECTIVES
 As state and local governments begin lifting or relaxing stay-at-home orders and
restrictions on social distancing and group gatherings, the Supreme Court of Missouri
provides these Operational Directives to the courts of this state to follow before resuming
court activities that have previously been suspended by this Court’s prior orders. The
Court recognizes that conditions vary across the state; therefore, appropriate measures for
resuming activities must vary as well. Appropriate precautions and safeguards in large,
metropolitan areas may not be necessary or appropriate in less-populated communities.
Moreover, differences in docket sizes, courtroom and courthouse layouts, and the number
of judicial employees make it difficult to establish functional and effective statewide
orders. Accordingly, the purpose of these Operational Directives is to facilitate local
solutions appropriate to local conditions.
 Nevertheless, Missouri courts must maintain a certain degree of uniformity in our
response to the COVID-19 pandemic. Lawyers, litigants, victims, judicial employees,
witnesses, jurors, and the public need to know what to expect when they engage with the
Missouri judicial system regardless of where that engagement occurs. Accordingly, the
purpose of these Operational Directives also is to establish some uniformity in approach
among Missouri courts to the challenges created by the COVID-19 pandemic even
though the solutions to these challenges may vary from time to time and place to place.
 As courts plan and consider gradually resuming activities previously suspended as
conditions permit, the presiding judge or chief judge of the applicable circuit or court are
directed to adhere to the following Operational Directives. The citizens of the state and
employees who enter Missouri courthouses and court facilities must feel confident for
their own safety and understand that the health and welfare of every litigant, juror,
witness, victim, judicial employee, attorney, and other individual involved in judicial
proceedings across the state is paramount in the decisions that are made under these
Operational Directives.
 As set forth below, Missouri courts have been operating at what is referred to
herein as “Operating Phase Zero” since this Court’s March 16, 2020, order suspending
most in-person court proceedings. All courts will continue to operate under those
conditions until the presiding judge or chief judge of the applicable circuit or court
determines – in light of the Gateway Criteria described below – that improvements in
local conditions warrant moving to a higher Operating Phase or that deterioration in those
conditions necessitates moving to a lower Operating Phase. Each Operating Phase
reflects differing approaches to in-person proceedings, personnel and staffing, and
courthouse operations. How those approaches will vary depends on local conditions, the
needs and rights of the litigants and victims, the physical layouts of court facilities, and
the abilities of the judicial and non-judicial personnel. No court can transition beyond the
conditions set forth in Operating Phase Three until the Court’s order dated May 4, 2020,
is amended or rescinded.
 These Operational Directives are designed to assist courts in ensuring public
safety when making decisions at the local level. Accordingly, presiding judges and
chief judges should monitor local circumstances and conditions on a regular basis.
Any movement to the next higher Operating Phase under these Directives can be
made only after a court has been in the prior Operating Phase for a period of at
least 14 calendar days. A court may revert back immediately to a prior Operating
Phase when local conditions and circumstances require it. Courts must notify the
public of any transition to a new Operating Phase in its COVID-19 Notice and send
any order or notice to this Court to be included on the Missouri Courts’ website.
Prior to changing Operating Phases, the presiding judge or chief judge shall also
submit to the Clerk of this Court a notice in the form attached as exhibit A.
 The Court is closely monitoring policy changes recommended by state and local
government agencies and the Centers for Disease Control and Prevention (CDC) and will
update these Operational Directives as necessary.
 Directives
 A. Gateway Criteria
 Consider each of the criteria below before resuming court activity or progressing to a
 new Operating Phase:
 1. No confirmed COVID-19 cases in the court facility within a 14-day period.
 2. Rescission or lack of stay-at-home orders or the relaxing of group gathering
 restrictions applicable to the community.
 3. Improving COVID-19 health conditions over a 14-day period in the community,
 including conditions such as the number of confirmed COVID-19 cases and
 related deaths in relation to a community’s population density, size of particularly
 vulnerable populations, and availability of medical facilities including emergency
 and intensive care capacity.

 2
4. Consultation with local health officials or departments concerning changes to
 levels of court and courthouse activities.
5. Consultation with local judiciary partners such as children’s division personnel,
 juvenile officers, members of the local bar, prosecutors and public defenders, law
 enforcement and probation and parole.
If these Criteria suggest local conditions are improving sufficiently, a presiding judge
or chief judge may consider moving to a higher Operating Phase and gradually
resuming and adapting previously suspended court activities.
If these Gateway Criteria suggest local conditions are worsening or that there is a
resurgence of COVID-19 cases in the community, a presiding judge or chief judge
should move to a lower Operating Phase including, when necessary and appropriate,
returning to Operating Phase Zero.
B. Operating Phase Approach
1. Based upon the Criteria above, a presiding judge or chief judge may order a
 change of Operating Phase for each locality either up or down.
2. Any order or decision moving and adapting courthouse operations from one
 Operating Phase to another must implement appropriate policies protecting
 litigants, witnesses, victims, judicial employees, attorneys, and other individuals
 involved in judicial proceedings through:
 a. Social distancing and/or occupancy rate restrictions;
 b. A COVID-19 Notice prohibiting access to the premises for individuals who
 have been exposed to or are exhibiting symptoms of COVID-19, listing
 necessary contact information for individuals not authorized to enter the
 premises, and advising those entering a court facility of the social distancing,
 occupancy rate and other precautionary restrictions taken to protect the health,
 safety and welfare of occupants;
 c. The use of masks or face coverings by judicial employees or members of the
 public;
 d. Heightened sanitation and disinfection of common and high-traffic areas,
 including consideration of acquiring additional hand sanitizers and wipes, hand
 sanitizing stations, and cleaning solutions for court facilities;
 e. Coordination with supervisors to ensure employees feeling ill stay at home;
 f. Procedures liberally permitting judicial employees to work from home when
 appropriate; and
 g. Preparation for the potential resurgence of COVID-19 cases following the
 resumption of court activities.

 3
C. Operating Phase Zero
1. Consult with local judiciary partners and rely on local health officials or
 departments and CDC guidance to adapt court operating decisions to local health
 conditions.
2. Suspend all in-person court proceedings consistent with the Court’s April 17,
 2020, Order.
 The suspension of in-person proceedings is subject to the following exceptions:

 • Proceedings necessary to protect the constitutional rights of criminal
 defendants, including the right to a speedy trial, and the rights afforded
 under section 544.676.3;
 • Proceedings pursuant to chapters 210 and 211 pertaining to juvenile
 delinquency and abuse, neglect, and termination of parental rights;
 • Proceedings pursuant to chapter 453 pertaining to adoption;
 • Proceedings in which civil or criminal jury trials are already in progress as
 of March 16, 2020;
 • Proceedings pursuant to chapter 455 pertaining to orders of protection;
 • Proceedings related to emergency child custody orders;
 • Proceedings related to petitions for temporary restraining orders or other
 forms of temporary injunctive relief;
 • Proceedings related to emergency mental health orders;
 • Proceedings pursuant to Chapter 475 for emergency guardianship or
 conservatorship;
 • Proceedings directly related to the COVID-19 public health emergency;
 • Oral arguments regarding time-sensitive matters; and
 • Other exceptions approved by the Chief Justice of this Court.

 Courts may set in-person hearings in the above listed proceedings but it does not
 mandate a judge set a hearing in any individual case. The presiding judge of each
 circuit court and the chief judges of each appellate court are authorized to
 determine the manner in which the listed in-person exceptions are to be conducted.
 Such proceedings shall be limited to the attorneys, parties, witnesses, security
 officers, and other individuals necessary to the proceedings as determined by the
 judge presiding over the proceedings. The judge presiding over such proceedings
 has the discretion to excuse jurors or other individuals who cannot or should not
 appear as a result of risks associated with COVID-19.

3. All proceedings that do not require in-person appearances of parties or counsel are
 not suspended and may continue in the manner and at the discretion of the judge in
 the matter as circumstances allow.

 4
 4. Encourage judges and court staff to continue utilizing all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent not prohibited by constitutional or
 statutory provisions.
 5. Implement appropriate levels of screening where possible at court facility
 entrances to mitigate against individuals experiencing symptoms related to
 COVID-19 from entering court facilities. Such screening may include
 temperature checks and screening questions.
 6. Suspend any non-essential travel by judicial employees for work-related functions.
 Continually reevaluate the Gateway Criteria for indications that a courthouse is ready
 to move to a different Operating Phase.
 D. Operating Phase One
 1. Continue to consult with local judiciary partners and rely on local health officials
 or departments and CDC guidance to adapt court operating decisions consistent to
 local health conditions.
 2. Reexamine and update local court orders and COVID-19 Notices as appropriate.
 3. Consider resuming only the most critical in-person proceedings and restrict grand
 and petit jury proceedings to only the most extraordinary, pressing, and urgent
 cases. (Operational Directives on conducting jury proceedings will be forthcoming
 from this Court as pandemic and health conditions improve.)
 4. Large venues and common areas such as break rooms should be closed. Keep
 occupancy rates in courtrooms, jury assembly rooms, and other areas in the court
 facility to an occupancy rate of 10 or less whenever possible and operate under
 strict social distancing protocols. Consider requiring the use of masks or face
 coverings. Require tape or other visible means be used to demark six-foot
 distances where practical. Allow vulnerable 1 litigants, witnesses, victims,
 attorneys, and other individuals involved in court proceedings to participate in the
 proceedings remotely or continue or postpone their required presence at the court
 facility.
 5. Encourage judges and court staff to continue utilizing all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent not prohibited by constitutional or
 statutory provisions.

1
 Vulnerable individuals are defined by the CDC as individuals 65 years or older or
individuals with underlying medical conditions, particularly if not well controlled,
including those who suffer from chronic lung disease, moderate to severe asthma, serious
heart conditions, immune disorders, obesity, diabetes, or chronic kidney or liver disease.
 5
6. Suspend any non-essential travel by judicial employees for work-related functions.
7. Implement appropriate levels of screening where possible at court facility
 entrances to mitigate against individuals experiencing symptoms related to
 COVID-19 from entering court facilities. Such screening may include
 temperature checks and screening questions.
8. Increase cleaning and disinfection of common areas and consider providing hand
 sanitizers and wipes.
9. Vulnerable judicial employees should work with supervisors to stay at home.
 Employees who live with or provide care for vulnerable individuals should do the
 same to the greatest extent possible to reduce chances that they could carry the
 virus to those vulnerable individuals.
10. Judicial employees should observe at least a six-foot minimum physical distance
 from others in all offices, meetings, and court proceedings. Require tape or other
 visible means be used to demark six-foot distances where practical. Additional
 precautions such as requiring masks or face coverings should be considered.
11. Allow judicial employees to work in shifts whenever possible and feasible to keep
 staffing levels to a bare minimum to support court activity.
12. Allow judicial employees to stay home where possible if the employee:
 a) Is subject to a quarantine or isolation order or is living with or caring for such
 an individual;
 b) Has been advised by a health care provider to self-quarantine or is living with
 or caring for an individual who has been advised to self-quarantine;
 c) Is considered high risk based on local or state health officials or departments
 criteria for contracting COVID-19, or is living with or caring for such an
 individual;
 d) Is experiencing symptoms of COVID-19 and seeking medical diagnosis, or is
 living with or caring for such an individual; or
 e) Is caring for a child whose school or place of care has been closed or whose
 childcare provider is unavailable due to COVID-19 precautions.
 A court cannot proceed to Operating Phase Two until it has completed at least 14
 days in Operating Phase One. Before proceeding to Operating Phase Two, a court
 must reevaluate the Gateway Criteria to ensure readiness to progress to the next
 Operating Phase.

 6
E. Operating Phase Two
1. Continue to consult with local judiciary partners and rely on local health officials
 or departments and CDC guidance to adapt court operating decisions to local
 health conditions.
2. Reexamine and update local court orders and COVID-19 Notices as appropriate.
3. Increased in-person court proceedings, including the most extraordinary, pressing,
 and urgent grand and petit jury proceedings, can begin where they can safely be
 conducted in compliance with social distancing protocols and occupancy rate
 limitations applicable to the local community. (Operational Directives on
 conducting jury proceedings will be forthcoming from this Court as pandemic and
 health conditions improve.)
4. Keep occupancy rates in large venues and common areas such as courtrooms, jury
 assembly rooms, jury deliberating rooms, break rooms, and other areas in court
 facilities to an occupancy rate of 25 or less whenever possible and operate under
 social distancing protocols. Consider requiring the use of masks or face coverings.
 Require tape or other visible means be used to demark six-foot distances where
 practical. Continue to allow vulnerable litigants, witnesses, victims, attorneys, and
 other individuals involved in court proceedings to participate in the proceedings
 remotely or postpone their required presence at the court facility.
5. Continue to encourage judges and court staff to utilize all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent practicable and not prohibited by
 constitutional or statutory provisions.
6. Continue to suspend any non-essential travel by judicial employees for work-
 related functions.
7. Continue to implement appropriate levels of screening at court facility entrances to
 mitigate against individuals experiencing symptoms related to COVID-19 from
 entering court facilities. Such screening may include temperature checks and
 screening questions.
8. Continue increased cleaning and disinfection of common areas and consider
 providing hand sanitizers and wipes.
9. Continue to allow vulnerable judicial employees to work with supervisors to
 establish reasonable accommodations for those vulnerabilities.
10. Judicial employees, when in the court facility, should continue to maximize
 physical distance from others. Six foot distancing should continue to be observed
 in all offices, meetings, and court proceedings. Require tape or other visible
 means be used to demark six-foot distances where practical. Additional
 precautions such as requiring masks or face coverings should be considered.

 7
11. Continue to allow judicial employees to work in shifts whenever possible and
 feasible to keep staffing levels to a bare minimum to support increased court
 activity.
12. Allow judicial employees to stay home if the employee:
 a) Is subject to a quarantine or isolation order or is living with or caring for such
 an individual;
 b) Has been advised by a health care provider to self-quarantine or is living with
 or caring for an individual who has been advised to self-quarantine;
 c) Is considered high risk based on local or state health official or department
 criteria for contracting COVID-19, or is living with or caring for such an
 individual; or
 d) Is experiencing symptoms of COVID-19 and seeking medical diagnosis, or is
 living with or caring for such an individual.
 A court cannot proceed to Operating Phase Three until it has completed at least 14
 days in Operating Phase Two. Before proceeding to Operating Phase Three, a court
 must reevaluate the Gateway Criteria to ensure readiness to progress to the next
 Operating Phase.
F. Operating Phase Three
1. Continue to consult with local judiciary partners and rely on local health officials
 or departments and CDC guidance to adapt court operating decisions to local
 health conditions.
2. Reexamine and update local court orders and COVID-19 Notices as appropriate.
3. Resume in-person court proceedings, including grand and petit jury proceedings,
 that can be conducted in compliance with social distancing protocols and
 occupancy rate limitations applicable to the local community. (Operational
 Directives on conducting jury proceedings will be forthcoming from this Court as
 pandemic and health conditions improve.)
4. Large venues and common areas such as courtrooms, jury assembly rooms, jury
 deliberating rooms, break rooms, and other areas in the court facility can operate
 under social distancing protocols. Consider requiring the use of masks or face
 coverings. Consider continuing to allow vulnerable litigants, witnesses, victims,
 attorneys, and other individuals involved in court proceedings to participate in the
 proceedings remotely or continue or postpone their required presence at the court
 facility.

 8
5. Continue to encourage judges and court staff to utilize all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent not prohibited by constitutional or
 statutory provisions.
6. Consider terminating enhanced screening procedures at court facility entrances.
7. Continue cleaning and disinfection of common areas and consider providing hand
 sanitizers and wipes.
8. Allow vulnerable judicial employees to return to work but encourage supervisors
 to make reasonable accommodations to address those vulnerabilities.
9. Judicial employees should continue to adhere to social distancing guidelines in
 court facilities. Additional precautions such as requiring masks or face coverings
 should be considered.
10. Consider resuming normal staffing schedules for judicial employees.
11. Consider discontinuing the suspension of non-essential travel by judicial
 employees for work-related functions.
12. Allow judicial employees to stay home if the employee:
 a) Is subject to a quarantine or isolation order or is living with or caring for such
 an individual;
 b) Has been advised by a health care provider to self-quarantine or is living with
 or caring for an individual who has been advised to self-quarantine;
 c) Is experiencing symptoms of COVID-19 and seeking medical diagnosis, or is
 living with or caring for such an individual.

 9
 EXHIBIT A

 Notice to the Supreme Court of Missouri of Higher/Lower Operating Phase

 I, _______________________, (presiding judge or chief judge) of

___________________________ notify the Supreme Court of Missouri that the following will

move to Operating Phase _______on the ___ day of ___________, 2020.

Mark all that apply:

__ Entire Judicial Circuit/Appellate District; or

__ County/Counties of ____________________________________________ within the Circuit;

and/or

__ Municipal Division(s) of ________________________________________within the Circuit.

Dated: _________________ __________________________________
 (Presiding Judge or Chief Judge)
 IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
 16TH JUDICIAL CIRCUIT, STATE OF MISSOURI

In Re: Updated Court Operations upon Re-Opening of Courthouses

 
 ADMINISTRATIVE ORDER 2020-___

 WHEREAS, the Centers for Disease Control and Prevention have declared that
the spread of COVID-19 has become a worldwide pandemic; and

 WHEREAS, the State of Missouri, Jackson County and various Mayors of cities in
Jackson County have previously entered stay at home Orders and other emergency
Orders requiring residents to remain at home except for activities essential to health and
safety, and requiring businesses to cease operations unless they are considered essential
businesses; and

 WHEREAS, the continuing operation of the 16th Judicial Circuit Court (“Court”)
has been deemed to be an essential governmental service and therefore, the Court has
remained open and operational during the term of all Stay-At-Home Orders, performing
core judicial functions, often through remote technologies including video and telephone
hearings and conferences; and

 WHEREAS, the previously entered stay at home Orders and emergency Orders
have been lifted or terminated and/or have been replaced with Orders allowing for the
phased and gradual re-opening of society, businesses, communities and the courthouses
in which the Court operates, while also including restrictions to minimize the potential
spread of COVID-19; and

 WHEREAS, the Missouri Supreme Court has issued several Orders regarding
court operations, the most recent of which includes Operational Directives related not
only to considering strategies to prevent the spread of COVID-19, but also directives
which provide for a phased approach toward easing restrictions related to court
operations, with a clear intent to move toward more complete court operations; and

 WHEREAS, notwithstanding the Court commencing a slow, deliberate plan moving
toward more complete court operations pursuant to Missouri Supreme Court Orders, the
Court’s operations will continue to be significantly modified; and

 WHEREAS, circumstances regarding COVID-19 have changed dramatically since
the Court’s issuance of prior Administrative Orders related to court operations; and

 1
 WHEREAS, it has been and continues to be imperative that the Court take steps
to protect the health and safety of employees of the Court, all judicial officers, all
attorneys, all litigants, all victims, all witnesses, any other individuals or entities who
have cases and hearings before the Court and all members of the general public who
interact with or have business with the Court; and

 WHEREAS, the Missouri Supreme Court has continued to authorize the
Presiding Judge of each Circuit to facilitate local solutions regarding the continuation
and/or restoration of court operations, while also considering and maintaining a
certain degree of uniformity; and

 WHEREAS, the Missouri Supreme Court has continued to encourage judges to
utilize all available technologies – including teleconferencing and video conferencing –
to limit in person courtroom appearances to the extent not prohibited by the constitution
or statutes as to the proceedings; and

 WHEREAS, the Missouri Supreme Court’s Operational Directives describe
criteria to be evaluated and considered regarding the continued operation of the Court
as well as the progression or regression to different Phases set forth in the Operating
Directives; and

 WHEREAS, the 16th Judicial Circuit Court operates in numerous buildings and
courthouses, including the Kansas City Courthouse, the Eastern Jackson County
Courthouse, the Family Court Divisions at the Family Justice Center, the Albert Riederer
Community Justice Complex and the Community Justice Building (herein collectively
referred to as the “Court Buildings”); and

 WHEREAS, pursuant to Section 478.240.2 R.S.Mo. and Section 15 of the Missouri
Constitution, the Presiding Judge has general administrative authority over all judicial
personnel and court officials in the Circuit as well as administrative authority over
dockets of the Court and the administrative and discretionary authority regarding the
manner in which any hearings are conducted in the Court.

 IT IS HEREBY ORDERED, effective immediately and continuing until rescinded,
amended, modified or extended in a subsequent Administrative Order, as follows:

 1. The Court will follow the Operational Directives and criteria set forth by
the Missouri Supreme Court as it works toward restoration of court operations, including
the utilization of local solutions appropriate to local conditions.

 2. The Court will submit to the Missouri Supreme Court in a regular and
timely manner, “Exhibit A, Notice to the Supreme Court of Missouri of Higher/Lower
Operating Phase” as set forth in and referenced in the Supreme Court’s Order dated May

 2
4, 2020, effective May 16, 2020. The Court will follow the applicable guidelines and
directives for the Phase specified in its submitted Exhibit A, supplemented by the specific
terms of this Administrative Order and any amendments hereto. To the extent this
Administrative Order provides local solutions or additional terms unique to the local
conditions presented to the Court, those solutions and terms shall continue to apply until
rescinded or modified by a subsequent Administrative Order.

 3. The Court shall continue to utilize all available technologies, including
teleconferencing and video conferencing, to the greatest possible extent for all
proceedings, hearings and/or conferences (collectively referred hereinafter as
“proceedings”) so as to not require the physical presence of persons in Court Buildings.
The Court will limit in person proceedings as much as possible.

 4. Subject to the provisions of paragraph 3 above, in person proceedings may
resume but only in very limited and extreme circumstances for critical proceedings in
extraordinary and urgent situations, based on a determination that alternative methods
for conducting said proceedings cannot occur, including a determination by the Judicial
Officer presiding over any such proceedings that it is not possible for such proceedings
to be conducted by telephone, teleconference, polycom, videoconferencing, or any other
method that does not require the physical presence of persons in Court Buildings. In
person hearings should be conducted only as a last resort when all other alternative methods
to proceed have failed.

 5. The Court Administrator has previously established procedures for pro se
litigants to deliver and/or file pleadings and other documents with the Court via fax
filing, email filing, and by creating drop boxes at designated entries to Court Buildings.
Those procedures are posted on Court Building doors, posted on the Court’s website at
www.16thcircuit.org, and posted on the Court’s Facebook page. Those procedures shall
remain in place as alternatives to pro se litigants filing said documents personally at the
courthouses.

 6. In all criminal cases where the defendant is in detention at the Jackson
County Detention Center or otherwise in custody at any other detention center or at any
other prison, said defendant shall not be personally transported to or brought into Court
Buildings for any hearing or conference. All hearings and conferences regarding any
such defendant shall be conducted via teleconference or videoconference, including
initial appearance and arraignment hearings.

 7. Each Judicial Officer and his/her division staff shall be responsible for
notifying all parties and counsel if his/her cases/dockets are being conducted by
teleconference, videoconference or the manner in which hearings will be held. Each
Judicial Officer and his/her division staff shall also be responsible for re-scheduling new

 3
hearing dates and notifying all parties and counsel of new hearing dates in the event cases
cannot be heard as scheduled.

 8. The Court may resume scheduling in person hearings on full orders of
protection, subject to social distancing requirements, limitations on the size of gatherings
as set forth in the applicable Operational Directives and other limitations set forth in this
Administrative Order. The in person hearings on full orders of protection that have
previously been continued by prior Administrative Orders will be re-scheduled by the
Court and if possible, given priority regarding hearing dates. Given the previous
suspension of said hearings, all Ex Parte Orders of Protection currently in existence will
be extended by operation of this Administrative Order until the full order of protection
hearing can be scheduled and actually occurs. In addition, because of the backlog of
Order of Protection cases, all Ex Parte Orders of Protection entered subsequent to this
Administrative Order which are not able to be heard within 14 days of the entry of the
Ex Parte Order, will be extended by operation of this Administrative Order until a full
order of protection hearing can be scheduled and actually occurs. Nothing in this
Administrative Order bars or prevents holding hearings on full orders of protection via
teleconference or videoconference. Therefore, if all parties in a particular case are
available to allow said hearing to be conducted via teleconference or videoconference,
said hearing shall proceed in that manner.

 9. When a defendant in a pending criminal case bonds out of the Jackson
County Detention Center, he/she is given a date for his/her initial appearance. Any such
date provided to a defendant shall be continued and the initial appearance will be held
90 days after the date provided at the time the defendant bonds out of the detention
center.

 10. While this Administrative Order remains in effect, judges presiding over a
civil or domestic case or matter may exercise their discretion to waive, for good cause
shown, any filing deadlines or time limitations set through Missouri’s e-filing system or
by court order, local rule, or Missouri Supreme Court Rules 41 through 81. This
authorization does not apply to any deadline or time limitations set by statute or
constitutional provision.

 11. The Court Administrator/Deputy Court Administrator may resume
programming operated by the Family Court Services, provided however, that the
resumption of said programming can proceed in compliance with the Operational
Directives, social distancing requirements, limitations on sizes of gatherings, other terms
of this Administrative Order and guidelines of the Centers for Disease Control and
Prevention.

 4
 12. All municipal courts in Jackson County, Missouri are subject to this
Administrative Order and are encouraged to take appropriate action consistent with this
Administrative Order and Centers for Disease Control and Prevention guidelines.

 13. The provision of Circuit Court Local Rule 68.3.1 which requires that each
party be represented by separate counsel, shall remain temporarily suspended.
Therefore, assuming all other requirements of Local Rule 68 are complied with, proposed
Judgments may be submitted by Joint signed Affidavit and entered by the Court when
only one party is represented by counsel instead of the requirement that both parties be
represented by counsel. All other terms of Local Rule 68 remain in effect.

 14. All nonessential court related travel for staff and judicial officers shall remain
suspended.

 15. All Court staff and all members of the public who appear at any Court
Building for hearings and/or to conduct any court-related business, shall comply with
all screening requirements and/or other requirements to mitigate against the spread of
COVID-19 which are imposed at all Court Buildings, including but not limited to
temperature checks and medical screenings in order to enter any Court Building, wearing
masks or other face coverings as a condition to enter any Court Building, wearing masks
or other face coverings in all public areas in all Court Buildings and social distancing.

 IT IS FURTHER ORDERED that to the extent the directives and declarations set
forth in this Administrative Order differ with the Court’s prior Administrative Orders,
this Administrative Order controls.

THIS ORDER MAY BE AMENDED, RESCINDED, MODIFIED OR EXTENTED AS
CIRCUMSTANCES REQUIRE.

IT IS SO ORDERED.

May 14, 2020 __________________________________
 ___________________________
Date David M. Byrn,
 yrn, Presiding
 Pr iding Judge

Certificate of Service

This is to certify that a copy of the foregoing was emailed to the following on May 14,
2020.

16th Circuit Court Judiciary and Staff
Frank White, County Executive

 5
Troy Schulte, County Administrator
Darryl Forte, Sheriff
Theresa Galvin, Legislative Chair
Members of the Legislature
Mary A. Marquez, Court Administrator
Jean Peters-Baker, Prosecutor
Ruth Petsch, District Defender

 6